Dueebe, Judge,
delivered the opinion of tlie court:
This is a suit by plaintiffs, a joint venture, to recover delay damages under two separate causes of action arising out of a contract which, plaintiffs had with the Department of the Navy for the renovation and reconstruction of Pier and Dry Dock No. 1 at the Long Beach Naval Shipyard, Long Beach, California. The case has been submitted to the court without oral argument.
Plaintiffs, corporations engaged in the general construction business, were awarded the contract on March 21, 1957 in the sum of $3,877,71)1.00. The purpose of the contract was to overcome the effect of past subsidence (i.e., sinking of the ground) and to provide for future subsidence by elevating the entire dock structure around Dry Dock No. 1. The dry dock was constructed in the shape of an elongated horseshoe, its position in the shipyard lying north and south with the south end seaward. The contract called for the removal of the existing dike wall aroimd the dry dock, and the construction of a new dock structure atop the old dock structure, such as to raise the height of the dry dock walls by the height of the new structure. The contract also called for the construction of a parapet wall, — a small section of wall about four feet in height — rising from the top of the inner wall of the new dock structure. The contract contained the standard changes, changed conditions, and disputes clauses. The original completion date was to be November 18,1958. During performance, the contract was modified by 62 change orders under which plaintiffs’ time for performance was extended 517 days to April 19, 1960, and the contract price increased to $7,050,626.31. Plaintiffs’ men and equipment completed all work on the contract by early December, 1959; therefore, the extension of time granted by the change orders for the period subsequent thereto of some 120 days was unnecessary insofar as plaintiffs’ own men and equipment were concerned. However, subcontractors were performing very minor work until mid-April, 1960.
*136 Plaintiffs allege in their two canses of action in the present suit that certain activities of defendant caused plaintiffs unreasonable delay in completion of the contract, with resulting damages. In order to treat these matters chronologically, this opinion will deal with the second cause of action, and then the first cause of action.

Second Cause of Action

This claim is concerned with the installation of concrete piles along the east side of the dry dock. The applicable specifications provided that the piles should consist of a 16-inch minimum outside diameter reinforced concrete casing 50-feet in length filled with concrete after driving. The piles were to meet a certain bearing capacity, and the specifications provided that if the required bearing capacity was not obtained with the lengths of piling specified, the Officer-in-Charge could direct that longer length piles be used. An equitable adjustment in price and/or time was contemplated for any such changes.
On June 14, 1957 the first load of concrete piles was delivered to the work site on the east side of the dry dock. Between then and July 1, 1957 progress on the pile-driving work was impeded by obstructions, and by the failure of the first six 50-foot piles to achieve the required bearing capacity. Obstructions had been encountered which caused the piles to shear off line, and in some instances, to crack or break. Subsequently, the Navy directed plaintiffs to stop work on the concrete pile driving since the piles were not obtaining the required bearing capacity. Tests were thereafter made of the ground conditions on the east side of the dry dock, and it was determined that longer piles were needed. There was no pattern associated with the bearing capacity of the piles along the east side and, therefore, it was necessary in the period from July, 1957-October, 1957, to establish bearing capacity almost on a pile-by-pile basis. (See finding 17.) During this period, therefore, plaintiffs were unable to drive piles at its normal rate of operation (14 — 16 piles in an 8-hour shift), and in fact, in August alone, plaintiffs were only allowed to drive four test piles. It was not until October 7, *137 1957 that plaintiffs finished driving all the piles along the line on the east side of the dock structure.
No satisfactory explanation could be offered for the unusual subsurface conditions which produced the great variations in the bearing capacity of the piles along the east side of the dry dock. A possible reason therefor was the difference brought about by a change in the water-table level caused by the earlier subsidence. Our trial commissioner has found, and we agree, that considering the subsidence that had taken place in the area, it would seem that reasonable prudence would have required the consulting engineers’ firm that prepared the specifications and drawings for the Navy to have made prior tests of the subsurface conditions.
As a result of various directives issued by the Navy covering tests, engineering services and the driving of 112 longer piles during the period in question, three change orders were issued to compensate plaintiffs for the additional work entailed thereby. (See finding 23.) Thereafter, plaintiffs asked for delay damages, which claim was denied.
It is clear from the record that plaintiffs were delayed in the construction of the east dock structure by reason of the directives issued by the Navy in connection with the driving of piles in that area. No work could be done by plaintiffs above the ground level on the east dock structure until the piles were driven. However, the trial commissioner found that examination of plaintiffs’ job record and the Government inspector’s reports do not indicate that plaintiffs were damaged in any way, or suffered increased costs because of the delays in driving piles in the east dock area. (See finding 27(b).) The commissioner further found (finding 27 (c)) that based on the job record, inspector’s reports, and testimony (1) the overall performance of work under the contract was not delayed or disrupted as a result of the pile driving problems, (2) plaintiffs’ men and equipment were fully utilized during the July-October 1957 period performing construction work that had to be done on other parts of the job, and (3) plaintiffs’ utilization of their men and equipment during the July-October period was similar to such utilization subsequent to that period.
*138 Under our Rule 66, the findings of the commissioner are presumptively correct. “To overcome this presumption, plaintiff must make a strong, affirmative showing to the contrary.” (Dodge Street Building Corporation v. United States, 169 Ct. Cl. 496, 501, 341 F. 2d, 641, 644 (1965). See also Commerce International Company, Inc. v. United States, 167 Ct. Cl. 529, 537, 338 F. 2d, 81, 86 (1964). Upon examination of plaintiffs’ exceptions to the commissioner’s findings, it is evident that plaintiffs have come nowhere near making the strong affirmative showing needed to upset these findings. Accordingly, the court adopts them, and as a matter of law, finds that plaintiffs are not entitled to recover on the second cause of action.

First Cause of Action

By October 14, 1958 plaintiffs had completed the driving of piles under the west side dock structure except for a cluster of four piles at the south end. They then commenced working on forms for the structure. In the meantime, the Navy Department had become concerned over whether or not the dry dock being constructed would be wide enough to accommodate the new nuclear carrier “Enterprise.” An analysis of construction plans showed that it would not be possible to get the “Enterprise” into the new dry dock because sponsons thereon (projections from the hull) would protrude outward and conflict with the parapet walls of the dock. Plaintiffs were, therefore, instructed on October 17,1958 to stop work on the walls and dock on a portion of the west side of the dry dock.
During the work hiatus on this portion of the west side, the Navy was having the drawings and specifications for the west side changed. The changes were to include a deletion of part of the parapet wall, and in lieu thereof, the construction of a curb and removable rail section, and the relocation of utility service outlets, floodlights and mooring cleats. After the stop order was issued, plaintiffs were able to work on the sections of the west wall not covered by the stop order, although they had to alter their plans to do so.
A second stop order was issued on November 14,1958. As a result of this order, plaintiffs were required to stop work *139 on an additional section of the west side. Again, plaintiffs bad to alter their construction plans, and this time additionally, had to lay off some carpenters and laborers. Plaintiffs were, however, able to continue a limited amount of work on the west side.
A third stop order was given to plaintiffs on November 18. From November 19 through November 26, 1958, plaintiffs were, therefore, precluded by the combined stop orders from doing any work on the west dock structure. However, they were constructively engaged during this six-day period in performing work under the contract outside the stop order area. For example, they were engaged during this period in constructing a retaining wall west of the dock structure, and in working on Pier 1 and elsewhere.
The new and reworked drawings and specifications were partially completed on November 26. These revisions were given to plaintiffs on that date, and work was thereafter partially re-commenced on the west dock structure. Defendant then greatly expedited delivery of the remaining plans and drawings. By December 17, 1958 plaintiffs had all the revised plans and drawings necessary to complete construction of the west side dock structure. Also, on that date the stop orders were no longer in effect.
In view of the additional work involved in making the required changes, a change order was issued by the Navy on June 15,1959, increasing the contract price by $122,579, and extending the time for completion of the contract by 62 days. In the meantime, plaintiffs on March 17,1959 submitted a delay damages claim in the amount of $61,094 on behalf of themselves and three of their subcontractors. The contracting officer disallowed the claim on the ground that it was a claim for damages, and as such, not a proper subject of compensation under the contract. Plaintiffs then appealed to the ASBCA which dismissed the appeal for lack of jurisdiction inasmuch as the claim was one for breach of contract. This is the claim that is before this court on the first cause of action.
Again in this cause of action, as in the one prior discussed, the trial commissioner’s findings preclude recovery by plain *140 tiffs. Upon examination of the record and plaintiffs’ exceptions to the findings, we conclude these findings are correct. Accordingly, the court adopts them.
These findings (51-58) as adopted by the court, state in summary form:
(a) Plaintiffs were continually engaged in performing work on the contract here in issue throughout the claimed delay period (October-December 1958) despite the stop orders.
(b) Plaintiffs’ men and equipment were not idled during the claimed delay as they were at all times able to perform other work on the contract.
(c) Plaintiffs presented no testimony to show costs for disruption of work.
(d) Plaintiffs had no difficulty either in laying off or rehiring employees.
(e) The issuance of the stop orders did not, therefore, unduly delay plaintiffs’ performance.
Plaintiffs are not, therefore, entitled to recover on the first cause of action. The petition is dismissed on both causes of action.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Herbert N. Maletz, and the briefs and argument of counsel, makes findings of fact as follows:
1. (a) Plaintiff Connolly-Pacific Company is a California corporation with its principal office and place of business in Long Beach, California.
(b) Plaintiff T. E. Connolly, Inc. is a Delaware corporation with its principal office and place of business in San Francisco, California.
(c) T. E. Connolly was at all pertinent times the president of both Connolly-Pacific Company and T. E. Connolly, Inc. His brother John L. Connolly was at all pertinent times vice-president of Connolly-Pacific Company and was also from time to time an employee of T. E. Connolly, Inc.
(d) The two plaintiff corporations were engaged in the general construction business, specializing in heavy construction work such as dams, highways, tunnels, and quarry, breakwater and revetment work.
*141 2. On March. 21, 1957, the plaintiffs, as a joint venture, entered into a competitive-bid contract with the Department of the Navy, Eleventh Naval District, Bureau of Yards and Docks, for the “Construction of Subsidence Remedial Measures, Increment No. 1”. The contract provided that it was “the declared and acknowledged intention and meaning to provide and secure complete and ready for use, without danger of inundation at maximum expected subsidence, a section of the east end of the yard, Pier No. 1 and Dry Dock No. 1 at the Long Beach Naval Shipyard at Long Beach, California.”
The contract specified the general nature of the work to be done as follows:
1-02. General Description. — In general, the work shall include, but is not limited to, the furnishing of all labor, tools, transportation and equipment, new materials, re-installation of salvage materials and equipment for the following: new dock structure and removal of existing dock dike wall, dry dock No. 1; relocation and new foundations for capstans and bollards; pedestrian and pipe tunnels, cyclopean walls, crane walls and retaining walls, demolition and abandoning storm drains and pump and sludge pits, sewers and appurtenant structures; new storm drain system; yard fill; paving; removal and salvage of yard railroad tracks; removal, salvage and/or relocation of crane tracks; demolition of service buildings; raising and remodeling of floodlight towers, sub-station and service buildings; construction of new pier deck structure and substation; modification of existing electrical service installations and construction of new electric service conduct and appurtenant structures; installation of new and relocation of utility piping and appurtenant construction; raising of 800 ton (dead weight) crane; and miscellaneous construction.
3. The amount of the contract was $3,877,711.00. Under the contract the work was to be started on March 30, 1957 and to be completed on November 19, 1958. Provision was made for the assessment of liquidated damages at the rate of $1,200 per calendar day for failure of the contractor to complete the work within the time specified in the contract. In fact, liquidated damages were not assessed.
*142 4. The contract contained the standard clauses usually found in Government construction contracts, including the following:
$ ‡ $
8. CHANGES
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this clause must be asserted in writing within 80 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing provided, in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise herein provided, no charge for any extra work or material will be allowed.
4. Changed Conditions
The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for', performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; provided that the Contracting Officer *143 may, if be determines the facts so justify, consider and adjust any such claim asserted before the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof.
6. Disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the head of the department, and the decision of the head of the department or his duly authorized representatives for the hearings of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, be final and conclusive: Provided, That, if no such appeal to the head of the department is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
♦1» v H»
5. (a) The background events leading up to the present contract were as follows: During the period 1941 to 1944, the Navy had constructed Dry Dock No. 1 at the Long Beach Naval Shipyard which was designed to accommodate the largest ships of the Navy then in service. The dry dock— about 1,100 feet long and about 155 feet from inner wall to inner wall — was constructed in the shape of an elongated horseshoe, its position in the shipyard lying north and south with the south end seaward. Particular places or areas about the dry dock were identified by station numbers on the east and west sides and the north and south ends, with the station numbers extending from NO+00 (at the south *144 end) to Nll+05 (at the north end) on each side of the dry-dock. See Appendix A.
(b) In the years prior to 195T an extraordinary earth movement known as subsidence (i.e., sinking of the ground) took place in the area of the Long Beach Naval Shipyard. In the dry dock area the earth had subsided to a point where it became evident that it would be necessary to undertake remedial measures to prevent the dry dock from becoming inundated by the ocean.
(c) A principal purpose of the contract was to overcome the effect of past subsidence and to provide for future subsidence by elevating the entire dock structure around Dry Dock No. 1. The contract called for the removal of the existing dike wall around the dry dock and the construction of a new dock structure atop the old dock structure, such as to raise the height of the dry dock walls by the height of the new structure. Thus, the top of the old structure was to become the floor of the new structure and the inner wall of the new structure was to become an extension of the old dry dock wall. The new dock structure was to be approximately 16 feet in height and approximately 30 feet in width along the east and west walls of the dry dock and around the north end of the dry dock. The new structure was to consist of a concrete outer and inner wall and a concrete deck to form a tunnel running along the east side, north end and west side of the dry dock, which tunnel was referred to as the “utilities tunnel” since the various utilities were to be housed therein. The contract also called for the construction of a parapet wall — a small section of wall of about four feet in height— rising from the top of the inner wall of the new dock structure.
(d) The contract provisions relating to the new dock structure were prepared with a view to insuring that the dry dock would accommodate the largest Navy ship then afloat, the aircraft carrier “U.S.S. Forrestal”.
(e) As set forth in finding 2, the Navy entered into the contract with plaintiffs on March 21,1957. The record does not show that the Navy, up to October 1958, made any studies or analysis to determine whether the new dry dock would be wide enough to accommodate a new nuclear carrier the *145 “Enterprise” which, the Navy had ordered on August 16, 1957, and the keel for which was laid down on February 4, 1958. See findings 40,41, infra.
6. The contract plans, specifications and drawings for the dry dock were prepared for the Navy by the consulting engineering firm of Moffatt & Nichol, Inc. of Long Beach, California. The two principals of that concern, Messrs. Moffatt and Nichol, had been employees of the contractor who had constructed the original Dry Dock 1 in the 1941-1944 period, Moffatt having been the contractor’s office engineer, and Nichol, a superintendent of construction.
7. When the contract involved here was initially advertised, bids were requested on four separate schedules or items. Schedule 1 encompassed the entire project; schedule 2 covered the entire project less one increment; and schedules 3 and 4 each represented a smaller increment. Plaintiffs were the low bidder on all four schedules or items. However, the Navy advised plaintiffs that it did not have the funds to make an award on any of the four schedules. Accordingly, the Navy re-advertised for bids on schedule 5, which schedule encompassed about 50 per cent of the original schedule 1. Plaintiffs were the low bidder on schedule 5 and were awarded the contract here in question in the amount (as set forth in finding 3) of $3,877,711.00. At the same time plaintiffs signed a supplemental letter addressed to the Navy stating they would contract to perform the other work called for by the initial invitation for bids when the Navy received additional funds therefor, subject to a time limit of August 1957, which was later extended by plaintiffs to September 1957. The Navy obtained additional funds and the additional work amounting to $2,699,399.00 was incorporated into the contract by a change order dated September 10,1957. Because of this change order, the contract completion time was later extended 90 days. Also, this change order disrupted the schedule plaintiffs set up to perform the work and required them to proceed in an entirely different way than the one previously planned.
8. (a) During performance, the contract was modified by 62 change orders (including the foregoing one) under which plaintiffs’ time for performance was extended 517 days to *146 April 19, 1960, and the contract price increased to $7,050,-626.31.
(b) Although the contract performance period was extended to April 19,1960, the books of the plaintiffs indicate that their last payroll period applicable to the job was November 28,1959, and it appears that by early December 1959 plaintiffs’ men and equipment had completed all work on the contract. Therefore, the extensions of time granted by the change orders for the period subsequent thereto of some 120 days were unnecessary insofar as plaintiffs’ own men and equipment were concerned.[1]
9. Plaintiffs’ claim encompasses two causes of action. The first cause of action is concerned with contract performance during the period October-December 1958. At the pretrial conference the parties agreed that the issue under that cause of action is whether there was unreasonable delay in the preparation and submission to the contractor of plans and/or drawings following the issuance of stop work orders on October 27, November 14 and November 18, 1958. Plaintiffs further contend, in conformity with a pretrial statement submitted to defendant before the pretrial conference, that the plans should have been prepared either at the time the contract was originally drafted or a sufficient time before the stop orders were given so that the work in question could have been completed without causing any delay to the plaintiffs.
The second cause of action is concerned with contract performance during the period July-October 1957. At the pretrial conference the parties agreed that the issue under that cause of action is whether or not the activities of the contracting officer (or more properly the Resident Officer in Charge of Construction) relative to pile-driving operations during the period July 1-October 7, 1957 were such as to cause unreasonable delay and resulting damage to the contractor.
In order to treat these matters chronologically, the following findings will deal with the second cause of action and then with the first cause of action.

*147
Second Cause of Action

10. Section 6-01 of the contract specifications called for the installation of four different types of piles: (1) H-section steel batter piling; (2) steel sheet piling; (3) reinforced concrete piling; and (4) timber piling. The present claim is concerned only with the installation of concrete spun piles (a type of reinforced concrete piling) along the east side of Dry Dock No. 1. The specifications applicable to such spun concrete piles provided:
6-02. Materials.
(c) Spun Concrete Piles
(1) General. Piles shall consist of a 16 inch minimum outside diameter reinforced concrete casing 50-foot in length filled with concrete after driving . . .
* * m * *
6-03. Drwmg.
* * * * *
(c) Concrete Piles shall be driven with an approved single acting steam hammer .... A water jet may be used to assist driving except for the last seven and one-half (714)_ feet, which shall be driven without the use of jets to a minimum bearing of 50 tons.
* * * * *
(e) All bearing piles shall be driven to the bearing specified as determined by the following formula:
* * * * *
L= ~jr^ for single acting hammers
In which w=weight of hammer in pounds, h=height in feet of hammer fall or stroke, s=the average penetration per blow for the last three blows in inches, L — bearing value in pounds, * * *
If the required bearing capacity based on the above formulae is not obtained with the lengths of piling specified, the Officer-In-Charge may direct that longer lengths be used for subsequent driving. Should additional pile lengths be required, an adjustment in contract price and/or time of completion will be made as covered in Clause 4 of U.S. Standard Form No. 23A.
*148 11. As set forth in finding 6, the specifications were prepared for the Navy by the consulting engineering firm of Moffatt & Nichol. There is no evidence that Moffatt & Nichol had any test bearings or soil analysis made in the area to determine what length of piles should be required; instead, members of that concern relied on their past experience in formulating the piling specifications and prescribing therein piles of 50-foot length. This figure was a judgment factor on the part of Moffatt & Nichol on which the Navy relied entirely and there were no discussions between the two about that figure prior to its incorporation into the contract specifications.
12. All the pile-driving work on the contract was performed by a subcontractor, Maceo Corporation. The record does not show that plaintiffs’ men and equipment were involved in this operation. However, the subsequent findings will, in most instances, refer to plaintiffs as performing the piling work and receiving instructions, since they were the prime contractor and the Navy dealt only with them.
13. (a) The first actual construction on the project started on April 9,1957. On May 21,1957, Maceo delivered its first load of sheet piling and thereafter was engaged in driving H-section piles. On June 14, 1957, the first load of concrete piles was delivered to the work site on the east side of the dry dock. Between then and July 1, 1957, progress on the pile-driving work was impeded by obstructions and by the failure of the first six 50-foot piles to achieve the required bearing capacity. Against this background, plaintiffs, on July 1, 1957, wrote to the Resident Officer-in-Charge of Construction (ROICC), as follows:
In driving piles in the area adjacent to the East Dry Dock Wall, considerable obstructions of an unknown nature have been encountered, causing piles to shear off line, and in some instances to crack or break.
In accord with “General Notes, Sheet 64 of 185; Y & D Drawing No. 776958; Special construction details shall be worked out with the O. in C.C. for obstructions encountered but not indicated on these plans or the Reference Plans”.
We request that such details be now worked out and that method of payment for the additional work be set forth.
*149 (b) On the same day (July 1, 1957), the Acting ROICC advised plaintiffs in writing, as follows:
This will confirm the oral directive by the Resident Engineer in Charge of Construction, Roy E. King, to the Contractor at 1000, 1 July 1957 to stop wort on the manufacture and driving of spun concrete piles for this contract because of obstructions encountered and the lack of the specified load-bearing capacity required.
When a method has been devised by the Officer in Charge of Construction for overcoming the obstructions and a pile provided of sufficient length to secure the specified bearing, the Contractor will be directed to proceed subject to a change in the contract in accordance with Clause 3.
(c) By another letter, also dated July 1, 1957, plaintiffs wrote to the ROICC, as follows:
As per verbal directive of Mr. Roy King, all work connected with spun pile operations was shut down at 10:00 hours, 1 July, 1957.
We urgently request, in accord with the above correspondence, that when a method for overcoming the obstructions has been devised by the Officer in Charge of Construction and a pile of sufficient length has been devised by the Officer in Charge of Construction, that we be advised immediately.
This shut down order, due to causes beyond the control of the Contractor, is causing costs over and beyond those contemplated in the bid submission and are, we believe, a matter of extra reimbursement to the Contractor from the Navy.
(d) On July 2, 1957 the Acting ROICC wrote plaintiffs:
This will confirm the oral directive by the Resident Engineer in Charge of Construction, Roy E. King, to the Contractor at 1430 2 July 1957, to stop work on the driving of steel sheet piling for this contract because of obstructions encountered in front of the caisson seat.
When a method has been devised by the Officer in Charge of Construction for overcoming the obstructions, the Contractor will be directed to proceed subject to a change in the contract in accordance with Clause 3.
14. By verbal instructions on July 3, 1957, confirmed by letter dated July 8, 1957, plaintiffs were directed to resume all pile work previously stopped by the letters from the *150 EOICC dated July 1 and 2, 1957. Plaintiffs were also requested to make an excavation at a specified location to uncover the pile cap under the crane girder for study by the EOICC of the existing conditions, which additional work (the EOICC stated) would be the subject of a change in accordance with Clause 3 of the contract.
15. On July 5, 1957, plaintiffs were orally directed to stop work on the driving of concrete spun piles at the location they were then working on at the east side because the piles were not obtaining the required 50-ton bearing capacity. Subsequently, the EOICC, by letter dated July 10,1957, confirmed an oral directive instructing plaintiffs to drive a 12-inch “H” pile to a depth of 90 feet and to begin driving three 50-foot concrete piles at intervals of 100 feet, as directed, between specified locations. These piles, the EOICC stated, would be for the purpose of testing the area to determine the length of piles to foe used to accomplish the bearing requirement. Plaintiffs were also advised that should additional pile length be required, an adjustment in the contract price and/or time of completion would be made pursuant to clause 4 of the contract.
16. About July 10, 1957, plaintiffs, at the request of the Navy, engaged a soil engineer to make soil tests in order to determine the length of piles necessary to achieve the required bearing capacity.[2] As a result of his tests, the soil expert recommended that longer piles be used where necessary ; he did not, however, specify what length of pile should be used.
17. There was no pattern associated with the bearing capacity of the piles along the east side of the dry dock and, therefore, it was necessary as a general rule, in the period from July to October 1957, to establish bearing capacity almost on a pile-by-pile basis. While a few 50-foot piles achieved bearing capacity, most piles required extensions of from 1 foot to 25 feet and these lengths varied throughout the east side area. This is illustrated by the following table *151 which shows the number of extra length piles installed on the east side of the dry dock and the extra lengths therefor:
JSwtra length Number of piles: for each
4- 1'
6_ 2'
9_ 3'
17_ 4'
5_ 5'
1_ 6'
8_ 7'
8_ 8'
5_ 9'
12_ 10'
4_ 11'
1- 13'
2_ 15'
1_ 16'
1- 17'
5- 18'
2_ 19'
1_ 20'
7_ 21'
6_ 22'
1- 23'
2_ 24'
1- 25'
112
18. (a) Under a normal operation for driving piles in an area comparable to the east side of the dry dock, except for having less water in the fill, there would be driven in a shift of 8 hours from 14 to 16 concrete piles, each 50 feet in length and 16 inches in diameter.
(b) In view, however, of the unusual subsurface conditions encountered at the east side of the dock, under which 50-foot piles did not achieve the required bearing capacity, the Navy issued directives which precluded plaintiffs, in the period from July to October 1957, from driving piles at a normal rate of operation on a line along the east side of the dock. More particularly, as a result of the Navy’s directives, plaintiffs were allowed to drive 11 piles in July 1957, 9 of which were test piles; in August 1957, plaintiffs were allowed to drive a total of 4 test piles; in September 1957, they were *152 allowed to drive a total oí 100 piles, or an average of about 5 piles per working day. On or about October 7,1957, plaintiffs finished driving and extending all the piles along the line on the east side of the dock structure and had completed the pouring of concrete caps atop such piles.
(c) In the meantime, by August 23, 1957, the piles at the southern end of the eastern side of the dry dock had achieved bearing capacity and plaintiffs were directed by the Navy to proceed with the completion of pile work between specified stations in that area. The Navy also advised that “when the piles are cleaned and filled with grout in accordance with the specifications, construction of the pile caps and dock structure may follow.” Plaintiffs started to grade for wall footings at this location on August 28, 1957, and on August 29,1957 were setting up forms for these footings. As of the early part of October 1957, only a small portion of the forms for the wall had been constructed and only a small portion of the wall.
19. On September 30,1957, the Navy issued a further directive to plaintiffs concerning further pilings along a different pile line on the east side of the dock. That directive was a restrictive order which required plaintiffs to drive seven specified 50-foot piles at intervals of 100 feet, whereas the pilings in that area were spaced approximately 36 to 40 inches apart. The effect of the order was to disrupt plaintiff’s normal schedule of driving pilings in sequence some three or four feet apart.
20. No satisfactory explanation could be offered relative to the unusual subsurface conditions which produced this great variation in the bearing capacity of the piles along the east side of the dry dock. A possible reason therefor was the difference brought about by the change in the water-table level caused by the sinking of the shipyard into the water table during the preceding 15 years.
21. (a) The specification provision (section 6-02(c)(l)) that piles should consist of a reinforced concrete casing 50 feet in length was placed therein by the Navy to give contractors a firm figure on which to bid and to provide a definite take-off point that would be common to all bidders. *153 However, because of the uncertainties inherent in pile driving, the specifications (section 6-03 (e)) provided (as set forth above) that if the bearing capacity was not achieved with the length of pile specified (50 feet), longer piles would be required and adjustments in the contract price and time of completion made as a result of thereof.
(b) It is the normal practice in pile-driving work for contractors to expect that when specific pile lengths are prescribed by the specifications, such as those involved here, the lengths thus prescribed will generally be ample to obtain the required bearing with the right, however, reserved in the Government under such specifications to require additional lengths, which are expected usually to be of a minor nature.
22. (a) Asa general rule, it is not the practice of the Navy to specify the installation of test piles in its construction contracts, and the present contract contained no provision relating to the driving of test piles in order to determine bearing capacity.
(b) As set forth in finding 11, there is no evidence that Moffatt & Nichol had any test bearings or soil analysis made in the east side of the dry dock area to determine what length of piles should be required but instead relied on their past experience in prescribing piles of 50-foot length. Considering that subsidence had taken place in the area for a number of years, it would seem that reasonable prudence would have required that Moffatt & Nichol have test piles driven and/or soil tests made prior to the preparation of the specifications and prior to the inclusion therein of a prescribed 50-foot length for concrete piles. Had such tests been made, it would have become evident that it would not be possible to specify a pile length that would have achieved a bearing capacity along the entire east side line. In such circumstances, it would seem that reasonable prudence would have dictated that the Navy depart from its general rule of not specifying the installation of test piles in its construction work and adopted instead a procedure, which is common practice in the construction industry, of issuing specifications requiring the driving of a prescribed number of *154 test piles by the contractor for a specified price per pile. In the event such procedure had been followed, the contractor would have been able to ascertain from such tests the length of the piles required for the structure and to make his plans accordingly.
23. As a result of the various directives issued by the Navy during the period in question, three change orders were issued to compensate plaintiffs for the additional work entailed thereby. These change orders were as follows:
Change order Date Work included Amount of change Extension
Nov. 19,1957 Engineering services; 6 piles and 13 test holes. $16,300.00 None.
“If” Nov. One 90' “H” in lieu of 50' 771.00 None.
“N” Jan. 27,1958 112 piles extended_ 18,800.00 34 days.
Total.. $35,871.00 34 days.
24. (a) Though the pile problems occurred in the period July-October 1957, it does not appear that plaintiffs gave any indication to the Navy until January 7, 1960 that they were delayed in their performance of the contract as a result of such problems. On January 7, 1960 plaintiffs wrote the EOICC, as follows:
This is notice of a claim for all costs occasioned 'by shut down and delay as evidenced in the above referred Serials, and under notice of our letter to the Navy dated 1 July 1957.
This shut down and the consequent delays caused by the failure of the specified 50' piling to reach the required load bearing capacity, was in no way the fault of the contractor, nor was the subsequent delay and spasmodic driving schedule set forth in the Navy letters, foreseen or foreseeable by the contractor in the original bid submission. The soil test conducted to determine the bearing value of the soil was also a delaying factor beyond the contractor’s control.
In making the bid and setting up for the project the contractor was guided by the specified length of piling set forth in the specifications and assumed the Navy had, by experience or tests, adequately determined the size and length of the piling necessary to carry the intended load in the ground in which the piling was to be driven. When the Navy finally authorized continued driving of *155 the 50' piling, and extending them by means of steel casing if the desired bearing was not reached, the number of piles to be driven at any one time was specified by the Navy, resulting in restricting the contractors’ operations to those number of piling specified. This number was far below that contemplated, expected and proven number of vertical piling the contractor could drive if not limited by directive. All of this procedure resulted in delay to the contractor on work related to the pile driving.
This subject claim is for costs occasioned by the referred Serials, which stopped the work and allowed only restricted pile driving. Such costs are limited to equipment standing-by idle, supervisory and office personnel at the job site, increase in wages for crews necessary to this and its related work, which increase would not have been necessary in the amount of days charged, had the work been allowed to proceed in the manner contemplated under the original bid.
We believe this claim to be fair and proper, due to direct stop order action by the Navy, which caused changed conditions and occasioned costs not foreseen or foreseeable in the oi’iginal bid submission.
Under pp 3 — changes; pp A — changed conditions; pp 5 — damages; pp. 6 — disputes of the contract, we submit the claim figure of $61,724.90, for all delay, for idled equipment and personnel, for wage increases, and all other costs as set forth in the accompanying exhibits.
(b) On February 5, 1960, the EOICC denied plaintiffs’ claim on the basis that there were no provisions under the contract whereby additional compensation could be allowed for other than performance of added work. Thereafter, the Chief of the Bureau of Yards and Docks (the contracting officer) disallowed the claim on the ground that it was a claim for damages and as such was not a proper subject of compensation under the contract. Plaintiffs then appealed to the ASBCA which dismissed the appeal concluding that in the absence (as here) of a suspension of work provision, it lacked jurisdiction to afford relief on a claim for stand-by costs and for the increased costs of performing unchanged work occasioned by alleged Government-caused delays to the contractor’s performance.
25. As set forth in finding 12, all the piledriving work on the contract was performed by a subcontractor, Maceo Cor *156 poration. The record shows that Macco’s pile driver was idle at times during the July-October 1957 period. However, Maceo did not file any delay claim with the plaintiffs.

Ultimate Findings With Respect to Second Oause of Action

26. The record makes it clear that plaintiffs were delayed in the construction of the east dock structure by reason of the directives issued by the Navy in connection with the driving of piles in that area. No work could be done by plaintiffs above the ground level on the east dock structure until the piles were driven and capped. Thus, the work of placing cement caps on top of the piles was delayed until piles achieving the requisite bearing capacity were driven, and the work of setting up forms which were to rest on the caps and of pouring concrete was delayed until the piles were driven and the caps put in place.
27. (a) Plaintiffs’ job record diary was made part of the record in this case. The purpose of this job record was to keep a running history of the job on a day-by-day basis. Also made a part of the record in this case were the daily reports of the Government inspectors on the job. The inspectors were required to maintain these reports, and the reports were checked by the supervisor for accuracy and completeness. These reports described the work being performed by plaintiffs and the men and equipment engaged in performing the work. Both plaintiffs’ job record and the inspector’s reports provided detailed accounts of the day-today operation of the work being performed, the problems encountered, and various other aspects of the job.
(b) Examination of the plaintiffs’ job record and the inspector’s reports does not indicate that plaintiffs were damaged in any way or suffered increased costs because of the delays resulting from the problems attendant to the obtaining of piles capable of achieving the required bearing capacity on the east side of the dry dock.
(c) On the basis of the job record, the inspector’s reports and the testimony, it is found (1) that plaintiffs’ overall performance of work under the contract was not delayed or disrupted as a result of the pile-driving problems that oc *157 curred in the July-October 1957 period; (2) that plaintiffs’ men and equipment were fully utilized during the July-October 1957 period performing constructive work that had to be done on other parts of the job, such as on the north side of the dry dock, the quay or cyclopean wall, and in the yard where forms were manufactured; and (3) that plaintiffs’ utilization of their men and equipment during the July-October 1957 period was similar to such utilization subsequent to that period.

First Cause of Action

28. During the month of September 1958, plaintiffs, through their subcontractor Maceo, were installing piles for the dock structure along the west side. As previously indicated, it was, of course, necessary to install the piles and cap them before erection of the new dock structure could go forward. See finding 26. However, the work could be section-alized so that as the piles were installed and capped in one section of the dry dock, the construction of the dock structure in that section could go forward although the piles were not as yet driven in another section. On September 30,1958, plaintiffs began to erect “footing forms” from the northerly end of the west side dock structure proceeding south. On October 13, 1958, concrete footings were poured in an area about mid-way on the west side. On October 14,1958, plaintiffs completed the driving of piles under the west side dock structure except for a cluster of four piles at the south end. On October 15 and 16,1958, plaintiffs were working on forms for the dock structure.
29. As set forth in finding 5(e), the Navy on August 16, 1957, ordered the new nuclear carrier the “Enterprise” (CYA (N)-65) and the keel for this carrier was laid down on February 4, 1958.
30. (a) About October 4, 1958, the BOICC at the Long Beach Shipyard received a telephone call from the Navy in Washington, D.O., inquiring as to whether or not the new dry dock being constructed would be wide enough to accommodate the new nuclear carrier. In response, the KOICC suggested that the construction plans for the carrier should *158 be sent to Long Beacli so that a determination with respect thereto could be made, which suggestion was followed. Analysis at Long Beach of such construction plans then showed that it would not be possible to get the “Enterprise” into the new dry dock because sponsons thereon (projections from the hull) would protrude outward and conflict with the parapet walls of the dock. For while the width of the new dry dock was 155 feet between the parapet walls (see finding 5(a)) and the width of the new carrier was only 133 feet, the analysis indicated that the sponsons would protrude outward about 20 feet at a level equal to the level of the parapet walls.
(b) The Navy was in a position to have known at least as early as August 1957 that the new dry dock which plaintiffs were constructing would not be wide enough to accommodate the new nuclear carrier.
31. As previously indicated in finding 5(a), the dry dock was constructed in the shape of an elongated horseshoe, its position in the shipyard laying north and south with the south end seaward. That finding also indicated that particular places or areas about the dry dock were identified by station numbers on the east and west sides and the north and south sides, with the station numbers extending from NO+00 (at the south end) to Nil+05 (at the north end) on each side of the dry dock. The west side dock structure encompassed an area ruiming from station NO+96 at the southern end to station N10+ 31 at the northern end. In order to place the succeeding findings in perspective, there is set forth in Appendix A a diagram depicting the approximate relative location of some of the station numbers which will be relevant.
32. After the analysis of the construction plans of the new nuclear carrier in October 1958 revealed that the drydock would not be wide enough to accommodate the new nuclear carrier, the Commander of the Long Beach Naval Shipyard, on October 20,1958, issued the following request to the Officer in Charge of Construction (OXCC), Eleventh Naval District:
1. Construction plans for the new CVA(N)-65 class carrier now under construction were recently received by the Long Beach Naval Shipyard. A study of these plans indicates that a change in the design of the reme *159 dial measures for Dry Dock No. 1 now being constructed under Contract NBy-4182 will be required in order to provide sufficient clearance between the sponson sections of the CVA(N) carrier and the parapet walls of the drydock.
2. Specifically, it is now considered that the following revisions are required:
a. Delete the S' high parapet wall on the west side of the drydock between stations N2+35 and N8+46 and construct in lieu a curb and removable rail section.
b. Provide mooring cleats at approximately 50' intervals along the west side of the drydock
c. Eearrange the location of utility service outlets along the west wall to the extent that they will not be an obstruction to the ships in drydock.
d. Eearrange the location of the drydock floodlights now planned for installation in the parapet walls between stations N2+35 and N8+46 on the east side.
3. The contractor is now placing forms and reinforcing steel along the west wall of the drydock. Although the above requirements will not represent a major change in design or construction, it is requested that the above provisions be incorporated in the contract plans and a change order issued as expeditiously as possible. Details of this study are available in the Public Works Department for consultation with your Architect and Engineer.
33. Upon receipt of the October 20, 1958 request for these changes, the OICC employed Moffatt & Nichol to prepare the necessary revised drawings and specifications. The OICC instructed the latter to expedite preparation of such modifications and authorized overtime to get that job done as quickly as possible. It was also agreed that Moffatt & Nichol should concentrate its efforts in those areas that were next in orderly construction progress and should provide preliminary drawings to plaintiffs so they could get back to work as quickly as possible.
34. (a) In the meantime, on October 17, 1958, a representative of the EOICC orally instructed plaintiffs to stop work on the walls and dock at the west side of the drydock between stations N2+35 and N8+46.5.
(b) On October 27, 1958 the EOICC wrote plaintiffs as follows:
This will confirm the oral direction of Mr. Eoy E. King, Construction Engineer, to Mr. John Connolly of *160 17 October 1958 to stop work on the walls and deck of the dock structure of Dry Dock No. 1 on the west side of the dock between Stations N2+35 and N8+46.5..
You will be directed to proceed with construction when plans can be provided for changes in curb, parapet wall, and location of cleats and utilities.
This change will be the subject of a change in the contract in accordance with Clause 3.
(c) On October 28, 1958, plaintiffs wrote the OICC as follows:
As per the above Serial and verbal directive, all work on the dock structure between the stations set out in the above referred serial, has been stopped.
We most urgently request that plans fully encompassing all contemplated changes, be put in our hands with utmost dispatch.
This shut down order, due to causes beyond the control of the Contractor, will result in sizeable increases in costs to the Contractor and his Sub-contractors. These costs and delays in time are, we believe, a proper matter for extra reimbursement and extension of time, to all parties concerned.
35. Plaintiffs’ method of operation was to work in a section or increment of about 100 feet, skip the next section, and proceed to the next section.
36. At the time the verbal stop order was issued on October 17, 1958, plaintiffs had work under way in varying degrees in various sections along the west side of the dock structure from station N9+91 to station Nl + 50. They stopped work on that date in all the sections specified by the order.
37. After the stop order was issued, plaintiffs were able to work in sections in the southern and northern parts of the west dock structure which were not covered by the stop order although they had to alter their plans to do so.[3] Thus upon issuance of the stop order, plaintiffs moved their men and equipment to a section of the west side dock structure *161 starting at station Nl+50 extending south (which was outside the stop order area) and erected wall forms at this area, which were ready for pouring by November 14, 1958. Also in the early part of November 1958, plaintiffs started erecting forms at a section, at the northerly part of the dock structure, between stations N8+46 and N9+38.
38. (a) Shortly before the close of work on Friday, November 14, 1958 (which day was also the end of the work week), the EOICC issued a second verbal order directing plaintiffs to stop work on the west side dock structure between stations Nl+50 and N9+91. This area encompassed almost the entire west side dock structure except for (i) a small section (between stations N9+91 to N10+31, the pour for which had been completed on November 4) at the northern extremity of the west structure, and (ii) a somewhat larger area (between stations Nl+50 and NO+96) at the southern end.
(b) This verbal directive was confirmed by the following letter dated November 17, 1958, from the EOICC to plaintiffs:
This confirms my verbal directive to Mr. John Connolly of 14 November 1958 to stop work on the walls and deck of the utility tunnel of Dry Dock No. 1 on the West Side between Stations Nl + 50 and N9 + 91.
You will be directed to proceed with construction when plans can be provided for changes in the parapet wall and location of cleats and utilities along the dock.
This change will be the subject of a change in the contract in accordance with Clause 3.
It is expected that plans will be available by November 20, 1958.
39. At the time the second stop order was received on November 14, plaintiffs had completed the forms on a section at the southern end of the dry dock structure (between stations NO+ 96 to Nl+99) and were ready to pour concrete therein on the next working day, Monday, November 17. A part of that section was included within the area covered by this second stop order (i.e., from stations Nl+50 to Nl+99) and plaintiffs, therefore, on the same day as they received *162 tlie second stop order canceled plans to pour the concrete in that section.
40. As a result of the second stop order, plaintiffs laid off some 27 carpenters and laborers.
41. As indicated in finding 38(a), plaintiffs had, on November 4, completed pouring the concrete in a section at the northern extremity between stations N9 + 91 to N10 + 31 (which was outside the second stop order). On November 17,1958 they began forming the parapet wall at this section; however, on the following day (November 18) plaintiffs were stopped from proceeding further in this section by the issuance of a third stop order by the EOICC. Also on November 18, the EOICC wrote plaintiffs as follows:
This confirms my verbal directive of 18 November 1958 to stop work on the walls and deck of Dry Dock No. 1 on the west side between Stations N9 + 91 and N10+31.
You will be directed to proceed with construction when plans can be provided for changes in the stairway due to a change in parapet wall and location of cleats and utilities along the dock.
This change will be the subject of a change in the contract in accordance with Clause 3.
It is expected that plans will be available by 20 November 1958.
42. From November 19 through November 26, 1958 (comprising six working days), plaintiffs were precluded by the stop orders from doing any work on the west dock structure. However, they were constructively engaged during this six-day period in performing work under the contract outside the stop order area. For example, they were engaged during this period in constructing a retaining wall west of the dock structure and in working on Pier 1 and elsewhere.
43. On November 26, 1958, plaintiffs were directed by the EOICC to proceed with construction between stations N9+91 and N10+31, between stations N0+57.0 and Nl+99.25, and between stations N8+46.5 and N9 + 91, in accordance with new and revised drawings presented to plaintiffs on that date. This verbal directive was confirmed by the following letter, dated December 1, 1958, which the EOICC sent to plaintiffs:
*163 This confirms the verbal directive as given by LTJG Newcomb to Mr. Norman Larison on 26 November 1958 to proceed with construction between Stations N94-91 and N104-31 on the walls and deck of Dry Dock No. 1 on the West side in accordance with new and revised drawings presented on 26 November 1958.
You are also directed to proceed with construction work between Stations N0+57.0 and Nl+99.25 and between Stations N8+46.5 and N9+91 in accordance with new and revised drawings as presented on 26 November 1958.
The drawings presented on 26 November 1958 were:
Revised drawings — Sheets 18, 22, 25, 37, 38, 39, 40, 41, 109, 111, 113, 118, 119, 120, 125, 126, 127, 128, 130, 131, 133,134,135,136, and Y&D 791614.
New Drawings — Y&D 846071, 846072, 846073 and 846074.
You are directed to proceed with construction as indicated above but you are requested to prepare your breakdown estimate for changes involved between Sta-¡ tions NO+57.0 and N10+31 in accordance with the plans as presented on 26 November 1958 and further plans between Stations Nl + 99.25 and N8+46.5 which will be available about 8 December 1958 and submit your estimate to the Eesident Officer in Charge of Construction.
Your breakdown estimate will be subject to final determination 'by a Board of Changes.
44. On December 3, 1958, plaintiffs acknowledged the EOICC’s letter of December 1 as follows:
Your letter of 1 December 1958, confirming verbal directive from Lt. Newcomb to proceed with a limited part of the work which was shut down, is acknowledged. The verbal directive along with one set of incomplete plans was received at 1600 on 26 November 1958.
Work has been resumed in the limited areas designated.
We urgently request that plans for the complete work be made available as soon as possible in order that needed materials may be placed on order and that new and revised forms may be fabricated to accomplish the changes contemplated.
45. On December 10, 1958, plaintiffs sent the EOICC the following letter in further regard to the latter’s letter of December 1,1958.
*164 We wish to call to your attention the fourth (4th) paragraph of the above referred Serial. Wherein we are directed to prepare a Breakdown Estimate for changes involved between Stations NO+57.0 and N10 +31, which stationing (sic) includes the entire work on the West side of the Dry Dock. For thiswork, there is as yet no official plan available, so we believe the notice to prepare a Breakdown Estimate from plans presented on 26 November 1958, to be premature and impossible of accomplishment.
We are, however, proceeding with that portion of the work as directed in the limited areas encompassed in paragraphs one (1), two (2) and three (3) of the referred letter.
As to that portion of the work lying between Stations Nl+99.25 and N8+46.5, we consider that work as shut down by verbal and written directives, Serial 491-1049, and 490-1084, and to remain so until plans and directive to again proceed are received by us.
46. (a) In order to get the revised plans to plaintiffs as quickly as possible, the Navy dispensed with red tape procedures. As the revised plans were prepared by Moffatt & Nichol and completed (see finding 33), an employee in the office of the EOICC hand-carried them from the Moffat & Nichol office to the office of the EOICC and thereafter to the plaintiffs. Generally, it was necessary for plans to go to San Diego for official approval before they were made available to a contractor, but that requirement was waived in this case in order that the plaintiffs could get the revised plans as soon as possible.
(b) Plaintiffs received the drawings described in the Navy’s letter of December 1, 1958 on Wednesday, November 26, 1958, at about 4:00 P.M. The next day, Thursday, November 27, was Thanksgiving and plaintiffs’ total labor force obtained a long week-end and did not work on Friday, November 28. With the plans received on November 26, 1958, plaintiffs, on Tuesday, December 2, began forming the west dock structure at stations N8+46 to N9+37, and this area was poured on December 19, 1958. On December 3, 1958, plaintiffs began to remodel the dock structure forms in the *165 area between stations NO+96 and Nl+99; on December 5, they began remodeling forms at stations N10+31 to N9+91 (the area affected by the third stop order, see finding 41). Plaintiffs poured the parapet wall at stations N10+30 to N9+31 on December 8,1958.
(c) The record establishes that with the revised plans made available to them on November 26,1958, plaintiffs were able to and in fact did commence work on the west side dock structure by December 2, 1958, and thereafter were able to continue working on the west side dock structure.
(d) On December 9, 1958, plaintiffs received a new set of plans, including several new sheets they had not had before. On December 10, 1958, plaintiffs began forming sections of the dock structure at stations N8+46 to N9+37 and continued this work until December 18, 1958. They then poured the sections on December 19.
47. (a) On December 17, 1958, the Navy delivered seven sets of plans and drawings to plaintiffs and advised plaintiffs by letter, dated December 19,1958, as follows:
This confirms my verbal direction to Mr. Norman Larison on 17 December 1958 to proceed with construction between Station Nl+99.25 and N8+46.5 on the walls and deck of Dry Dock No. 1 on the West side in accordance with Change “O” drawings presented to Mr. Norman Larison on Thursday 18 December 1958.
You are requested to submit a breakdown estimate for the change in contract price brought about by Change “O”.
(b) On December 18,1958, plaintiffs began setting up wall forms at stations N+99.25 to N3+07.25, which stations were included in the verbal order to proceed given on December 17, 1958.
(c) The weight of the evidence indicates that by December 17, 1958, plaintiffs had all the revised plans and drawings necessary to complete construction of the west side dock structure. Also on that date the stop orders were no longer in effect.
48. With respect to the size of plaintiffs’ labor force in the October-December 1958 period, on October 16,1958 (the day *166 before the issuance of the first stop order) plaintiffs had some 79 hourly employees working on the job. Between October 17 and November 14 — when the second stop order was issued — plaintiffs’ work force varied from 75 to 80. As indicated in finding 40, as a result of the second stop order, plaintiffs laid off some 27 carpenters and laborers; and by November 24 the work force had fallen to 51. By December 6 the number had increased to 66 and by December 17 (when the stop orders were no longer in effect) the number had increased to 71, rising thereafter to 78 as of the end of December.
49. In view of the additional work involved' in making the required changes, a change order was issued by the Navy on June 15, 1959 increasing the contract price by $122,579 and extending the time for completion of the contract by 62 days.
50. In the meantime, plaintiffs on March 17, 1959, submitted a delay damages claim to the BOICC in the amount of $61,094 on behalf of themselves and three of their subcontractors. The contracting officer disallowed the claim on the ground that it was a claim for damages and as such was not a proper subject of compensation under the contract. Plaintiffs then appealed to the ASBCA which dismissed the appeal for lack of jurisdiction inasmuch as the claim was one for damages for breach of contract.

Ultimate Findings With Respect to First Cause of Action

51. The record establishes that plaintiffs were continuously engaged in performing work on the contract here in issue throughout the claimed delay period (October-December 1958). The record also establishes that despite the stop orders which were issued in October and November 1958, plaintiffs’ men and equipment were constructively engaged in performing work required by the contract.
52. The record shows that the only time plaintiffs were prevented from working on some part of the west side dock structure was from November 19 to November 26,1958, dur *167 ing wbicb period plaintiffs were performing other construction work under the contract.
53. (a) The reasonable inference from the record is that the Navy’s issuance of stop orders in October and November 1958 disrupted the orderly progress of the work scheduled by plaintiffs during the Octo'ber-December 1958 period. However, plaintiffs have not presented testimony to show, nor does the record show, what costs were incurred as a direct result of such disruptions.
(b) The record does not indicate that plaintiffs had any apparent difficulty either in laying off and rehiring employees or in shifting employees from one work area to another as the occasion demanded. Nor does the record indicate the costs incurred in such undertakings.
54. The preponderance of evidence in the record does not indicate that plaintiffs’ men and equipment were idle during the claimed delay period because of the stop orders.
55. The preponderance of evidence in the record shows that plaintffs’ utilization of equipment during the claimed delay period was normal.
56. The record warrants the conclusion that the stop orders did not unduly delay plaintiffs in the performance of their contract.
57. The changes which precipitated the stop orders were within the scope of the contract.
58. After the issuance of the stop orders, the Navy made every effort to prepare and transmit to plaintiffs as expeditiously as possible revised plans and drawings. There was no unreasonable delay in the preparation and submission to plaintiffs of such revised plans and drawings.
CON CLTTSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover on either cause of action, and the petition is dismissed.
*168 APPENDIX A

 Plaintiffs’ job records indicate that subcontractors were performing very minor worls until mid-April 1960.

 The soil expert was paid for his services by plaintiffs, who in turn were reimbursed therefor by the Navy.

 In accordance with a Navy directive preventing plaintiffs from obstructing the normal operations of the dry dock during the construction work, the east wall of the dry dock was practically completed before work on the west side was started.