**William F. SANGEMINO**

v.

**The UNITED STATES.**

**No. 100–77.**

United States Court of Claims.

March 25, 1981.

William F. Sangemino, pro se.

Frank M. Rapoport, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and KUNZIG and BENNETT, Judges.

## OPINION

FRIEDMAN, Chief Judge:

The defendant has filed exceptions to the recommended decision of Trial Judge Wood which challenge the trial judge's rulings (1) that under 10 U.S.C. § 687 (1976) the plaintiff was entitled to readjustment pay following his release from active duty as a Reserve officer of the Army and (2) that on its counterclaim seeking return of money the plaintiff received as bribes during his service on active duty, the defendant may recover only $2,000 and not the $75,000 it sought. After hearing oral argument, we uphold the trial judge on the amount under the counterclaim but conclude that the plaintiff is not entitled to readjustment pay.[1]

### I.

In March 1966, the plaintiff, then a captain in the United States Army Reserve, entered on active duty with Selective Service Headquarters in New York City. He did so at the request of the Director of the Selective Service System and with the written understanding that he would remain on active duty only as long as the Director wanted him to serve.

In the fall of 1968, the plaintiff met Nathan Lemler when the latter visited

---

1. We adopt the trial judge's findings except for findings 8(c) (second sentence), 8(d) (second sentence), 8 n.11, 10 n.14, 11 n.15, 12 n.17, 14 n.20, and 15(a) (third sentence), which are unnecessary to our decision. We have not reprinted the findings because their substance is included in our opinion.

plaintiff's office. Lemler told plaintiff that he was engaged in aiding young men in being admitted to medical schools and that he had come to New York to obtain information regarding the selective service status of some of his clients. Between that time and 1972, according to Lemler's testimony in this case, he gave the plaintiff monetary bribes in return for the plaintiff's assistance in doing things that aided his "clients."

On September 30, 1974, plaintiff was indicted in the United States District Court for the Southern District of New York on three counts, charging conspiracy to defraud the United States, accepting a bribe as a public official, and making a materially false statement before a grand jury. Lemler was named as a co-conspirator but not as a defendant. Another indictment charging plaintiff with conspiracy was returned in February 1975. After a jury trial the plaintiff was convicted under all three counts on April 18, 1975, and sentenced to 4½ years in prison. The Court of Appeals for the Second Circuit affirmed on May 7, 1976 (538 F.2d 316).

On April 25, 1976, under the circumstances we describe below, the plaintiff was released from active military service as a major. The plaintiff began serving his prison sentence in August 1976. In May 1977, the Army proposed to drop plaintiff from its rolls, but the record does not show whether this was done.

II.

Under 10 U.S.C. § 687(a) (1976), a Reserve commissioned officer of the Army who, after completing at least 5 years of active duty (which the plaintiff did), and is involuntarily released from active duty (as the plaintiff was), is entitled to readjustment pay not exceeding $15,000. This provision does not apply, however, to an officer who

(b)(3) under regulations to be prescribed by the Secretary of Defense ... is released from active duty because of moral or professional dereliction.

The determination whether plaintiff's release from active duty was "because of moral or professional dereliction" requires examination of the circumstances surrounding his release and their evaluation in light of the governing regulations.

A. The Director of Selective Service, Byron V. Pepitone, first learned of plaintiff's indictment on or shortly after the indictment was returned on September 30, 1974. Following the plaintiff's conviction, the Director, on April 29, 1975, informed the plaintiff that he proposed to eliminate the plaintiff from the military service. By letter of June 22, 1975, the Director recommended to the Department of the Army that this be done. The letter stated in part:

The factual allegations to support the above recommendation for elimination are as follows:

1. Conviction in a United States Court of conspiracy to defraud the United States.

2. Conviction in a United States Court of bribery.

3. Conviction in a United States Court of perjury.

4. The loss of his ability to perform duty with the System due to a lack of public confidence in his integrity as a result of these convictions.

5. Conduct unbecoming an officer.

The Director recommended that plaintiff be eliminated pursuant to chapter 5 of AR 635–100, dealing with the elimination of officers from the Army. The Army informed the Director, however, that that regulation was inapplicable to Reserve officers assigned to the Selective Service System (as the plaintiff was) and that the plaintiff could be released without following the procedures that regulation requires, including review of the matter by a board of officers. The Army indicated that the plaintiff could be released "as requested" under AR 135–215, which provides for automatic release from active duty upon the termination of a Reserve officer's assignment to the Selective Service System.

By letter of January 15, 1976, to the Secretary of the Army, the Director, appar-

ently heeding this suggestion, requested that the plaintiff be reassigned to the U. S. Army Transfer Point, Ft. Hamilton, New York, "and released from active duty." The letter described the plaintiff's indictment, his conviction of defrauding the United States, bribery, and perjury, and his sentence to 4½ years' imprisonment. His letter stated:

The Selective Service System is undergoing a drastic reduction in force. It is manifestly unfair to involuntarily separate dedicated and hard-working officers with unblemished records and at the same time retain an officer who has been convicted of a felony. In fact, if it were not for his current status we would shortly initiate action to release him from his active duty because of mission changes and resultant budgetary constraints.

At the trial, the Director testified:

I could not have an officer aboard who had been convicted who would remain on active duty well beyond their time on the basis of the speed with which the United States Army was willing to move and this letter was to expedite the procedure and was based upon the Army's considered judgment as the way to effect the termination.

On March 22, 1976, the Manpower Administrator of the Selective Service System wrote the plaintiff that:

Due to your being surplus to the needs of the New York City Headquarters, Selective Service System and since there is not a suitable position vacancy for you elsewhere within the System, it will be necessary to request your release from extended active duty not later than ninety days from your receipt of this notification.

This letter was the standard form used to notify an officer who was being released from active duty due to a reduction in force. The plaintiff consented to his release from active duty in 30 days (on April 25, 1976), and he was released on that date. His release was accomplished pursuant to AR 135–215 and 600–31, which govern the release of officers whose services are no longer required. The plaintiff's DD Form 214, "Report of Separation from Active Duty," stated that the character of his service was "Honorable," which is the customary characterization of the service of an officer released as surplus.

██ B. The conduct for which the plaintiff was convicted—conspiracy to defraud the United States, accepting a bribe, and perjury, all relating to his military duties—unquestionably was "moral or professional dereliction." The facts we have set forth in part A demonstrate that the plaintiff was relieved from active duty "because of" that dereliction.

The sole reason the Director of Selective Service initially recommended the plaintiff's elimination from the Army was the plaintiff's criminal conviction. The only reason the Army rejected this recommendation was because the elimination could not be accomplished pursuant to the procedure the Director proposed to use. The Army suggested to the Director another procedure that could accomplish the same result. The Director then recommended to the Secretary of the Army that the alternate procedure proposed be used to release the plaintiff from active duty.

In making the latter recommendation, the Director again made clear that he was proposing the step because of the plaintiff's criminal conviction. Although the Director pointed out that the Selective Service System was undergoing a "drastic" reduction in force, so that the plaintiff otherwise would soon have been released from active duty, he explained that he was seeking earlier action because it was "manifestly unfair for us to involuntarily separate dedicated and hardworking officers with unblemished records and at the same time retain an officer who has been convicted of a felony."

The Director testified in this case that initially he requested the Army to eliminate the plaintiff from the military "based upon" the five reasons stated in his letter of June 22, 1975 (*supra* at 47), all involving the plaintiff's conviction, which "relat[ed] to moral dereliction" and that he "couldn't afford to have a duty officer with the Se-

lective Service System who had been convicted." The Director stated that his decision to release the plaintiff, reflected in his two letters requesting the Army to take that action, was "based solely on what [he] believe[d] to be moral dereliction."

On this record there is no doubt that the reason the plaintiff was released from active duty was his criminal conviction. Although the impending reduction in force in the Selective Service System might have resulted in the plaintiff's release from active duty shortly after he was actually released even if he had not been convicted, it was his conviction that triggered his release and caused it to take place when it did.

C. The remaining question is whether the plaintiff's release from active duty nevertheless was not "because of moral or professional dereliction" in view of the Army's use of procedures to effect that release that normally would not have been employed to release an officer for that reason.

As noted, 10 U.S.C. § 687(b)(3) makes the provision for readjustment pay inapplicable to officers who, "under regulations to be prescribed by the Secretary of Defense," are released from active duty because of moral or professional dereliction. The Secretary's pertinent regulation, Department of Defense Directive No. 1240.4, August 6, 1968, "prescribes policies . . . for determining eligibility for readjustment pay of nonregular personnel who are released from active duty because of moral or professional dereliction" (section I). Section III A provides that release pursuant to a court-martial sentence, dropping from the rolls, or discharge under conditions other than honorable, "will be conclusively presumed to be because of moral or professional dereliction." Section III B provides that release from active duty under other conditions will be presumed "not because of moral or professional dereliction," unless a determination of moral or professional dereliction has been made under regulations prescribed by the Secretaries of the Military Departments; such determination will be made only after the findings and

recommendations of a board of officers has been considered.

Similarly, the Department of Defense Manual entitled "Entitlement for Readjustment Pay" states in table 4–4–6:

A member dismissed or discharged as a result of trial by court-martial, dropped from the rolls of the service concerned, or administratively discharged under other than honorable conditions is presumed to be separated because of moral or professional dereliction. An honorable discharge or discharge under honorable conditions is presumed to be not due to moral or professional dereliction unless the Secretary of the service concerned determines it to be such. Do not pay readjustment pay until character of discharge is determined.

The Army has a procedure to identify officers who, because of adverse circumstances, should not be the beneficiary of favorable personnel action. It is called "flagging," and involves placing a notice in the officer's military file which suspends any favorable personnel action. The plaintiff's file was "flagged" when he was indicted. Since release from active duty is characterized as a favorable personnel action (AR 600–31(1)(h)), the presence of the flag in the plaintiff's file ordinarily would have precluded his release from active duty. In this case, however, either the flag was overlooked or the Army determined that because of the special circumstances of the plaintiff's situation discussed previously, he should be released from active duty as soon as possible.

Under Directive 1240.4, the fact that no board of officers had made findings and recommendations concerning the plaintiff's release from active duty meant that his release was "presumed not because of moral or professional dereliction." Unlike the situation of officers who have been released pursuant to court-martial, dropped from the rolls, or given a discharge other than honorable, and who under the directive are conclusively presumed to have been released because of moral or professional dereliction, the presumption that in other situations the

release was not for that reason is rebuttable.

In this case, for the reasons given in part II.A. of this opinion, the facts establish that the plaintiff was released because of such dereliction. Any contrary presumption resulting from the absence of an adverse determination by a board of officers therefore has been rebutted.

The fact that the administrative procedures by which the plaintiff was released from active duty are not those normally used to release an officer for moral or professional dereliction does not establish that the officer was not released for that reason. To the contrary, the intendment of 10 U.S.C. § 687(b)(3) is that an officer, who in fact is released because of moral or professional dereliction, is not to receive readjustment pay. To hold that that section requires that the plaintiff receive readjustment pay because of the administrative procedures used in releasing him would be to elevate form over substance and to ignore the actual reason for plaintiff's release. *Cf. Monaco v. United States*, 175 Ct.Cl. 591 (1966), where we upheld the denial of readjustment pay to an officer who had been released after a board of officers had recommended his release with a general discharge because of homosexual conduct, but did not state that its recommendation was based upon a finding of moral dereliction. Noting that the officer's moral dereliction was "the only charge made against this officer," we held that "the conclusion that it was [based on moral dereliction] is so inescapable that we must treat this possible deviation from the precise procedure prescribed as inconsequential." *Id.* 594.

Indeed, when this case was before us at an earlier stage, we ruled in effect that the reason for the plaintiff's release from active duty could not be determined on the basis of the formal or procedural aspects of his release. In denying cross-motions for summary judgment and remanding the case to the Trial Division, we stated that on the plaintiff's motion

> the as yet unresolved factual issue is whether plaintiff was in actual fact re-

leased from active duty because of moral or professional dereliction (within the meaning of 10 U.S.C. § 687(b)) even though the documents releasing him from active duty did not refer on their face to moral or professional dereliction but gave other reasons for his release. [Order entered April 27, 1978.]

In sum, the facts surrounding the plaintiff's release from active duty demonstrate that that release was "because of" moral or personal dereliction. The plaintiff is not entitled to readjustment pay.

## III.

In response to the plaintiff's suit for readjustment pay, the defendant filed a counterclaim "to recover the bribes, gratuities, kickbacks, things of value and secret emoluments and commissions paid to plaintiff during the period that he was on active duty with the United States Army" "in the amount of $50,000 plus any additional amounts hereafter established as having been accepted by plaintiff." The government may recover from one of its employees the amount that employee received as bribes in connection with the performance of official duties. *Jankowitz v. United States*, 209 Ct.Cl. 489, 533 F.2d 538 (1976); *Continental Management, Inc. v. United States*, 208 Ct.Cl. 501, 527 F.2d 613 (1975). We held in our order of April 27, 1978, that

> plaintiff's conviction in the Southern District of New York of accepting bribes in violation of 18 U.S.C. § 201(c)—Count Two of Indictment 74 Cr. 928—establishes that he did unlawfully accept a certain (as yet undetermined) amount of bribes for which he would be liable to the Federal Government if action were timely brought.

The only remaining question, therefore, is the amount of bribes the defendant is entitled to recover.

At the trial Lemler testified that he had paid the plaintiff at least $75,000. The plaintiff testified that he had received no more than $1,200 to, at the outside, $1,400 from Lemler. The trial judge, finding that

"Lemler was not a credible witness" (finding 18) and that the plaintiff's testimony concerning the amount he received from Lemler "cannot be fully credited" (finding 20(c) n.31), found that "[t]he weight of the credible evidence is that the sums of money so accepted by plaintiff amounted to a total of no more than $2,000." (Fdg. 20(c).)

In rejecting Lemler's testimony, the trial judge found that

[t]he few slim threads of truth undoubtedly woven into the total fabric of Lemler's lengthy testimony are so obscured by other factors—contradiction, exaggeration, inconsistency, implausibility, and the like—as to render the whole unbelievable. [Fdg. 4(a).]

and that Lemler's

testimony was marked (indeed, filled) with contradictions, changes in his story, speculations, unfounded conclusions, exaggerations, and blatant disregard of Lemler's oath to testify truthfully.... On this record, Lemler's testimony is incredible, unworthy of belief, and unprobative with respect to the question of the amount of bribes paid to plaintiff by (or on behalf of) Lemler in connection with Lemler's selective service "scheme" during the period 1968 to 1972. Although it is established that plaintiff unlawfully accepted a certain amount of bribes, there is no evidence in the record that anyone other than Lemler was the source of such bribes, and Lemler's testimony in this case cannot be accepted as establishing that plaintiff received from Lemler any stated and determinable amounts of dollars. [Fdg. 18.]

■ The government urges us to reject the trial judge's determination that Lemler was not a credible witness and to award it $75,000 on its counterclaim. It mounts a lengthy and intricate argument designed to show that Lemler was credible and should be believed. In effect, it urges us to determine *de novo* the factual issue of the amount of bribes Lemler paid to the plaintiff. We decline to do so.

■ Our rule 147(b) provides that in reviewing a trial judge's report "[d]ue regard shall be given to the circumstance that the trial judge had the opportunity to evaluate the credibility of the witnesses; and the finding of fact made by the trial judge shall be presumed to be correct." The trial judge observed Lemler during the 4 days over which he testified. The trial judge's findings pointed out in detail numerous instances in which Lemler's testimony was inconsistent, contradicted by other evidence, exaggerated, implausible, or obviously false. We cannot say that the trial judge improperly rejected Lemler's testimony or substitute our judgment for that of the trial judge regarding the credibility of this witness.

In addition to asking us to reevaluate this lengthy record, the government urges two other reasons why we should reverse the trial judge's determination that the weight of the credible evidence establishes that the plaintiff received only $2,000 from Lemler. First, it asserts that that ruling "Has Cast a Shadow on the Legitimacy of Plaintiff's Criminal Trial." The argument apparently is that because the jury in the criminal trial must have believed Lemler's testimony, which was that he paid the plaintiff more than $50,000, it was inconsistent and improper to reject that testimony in this case.

■ Different people, however, may react differently to the same witness. There is no inconsistency between the jury's apparent acceptance of Lemler's testimony in the criminal case and the trial judge's rejection of it in this case. Moreover, Lemler's testimony in the criminal case and his demeanor there may have been more credible than during his courtroom appearance in the present case.

■ Second, the government contends that Lemler had a reputation for veracity in the law enforcement community, whereas the plaintiff is a convicted perjurer. The government's claim concerning Lemler's reputation for veracity was based on the testimony of Jeffrey Harris, a former United States Attorney who had prosecuted the plaintiff. Harris admitted, however, that communities other than law enforcement

found Lemler incredible. Assuming that evidence regarding Lemler's reputation for truthfulness in the law enforcement community was properly admitted (*but cf. Michelson v. United States*, 335 U.S. 469, 477, 69 S.Ct. 213, 219, 93 L.Ed. 168 (1948)), the trial judge was not required to give that evidence the weight the government ascribes to it. The trial judge, based on all evidence before him, found that the "plaintiff was a credible witness, while Lemler was not." (Fdg. 19, n.29.) On this record we cannot reject that finding.

■ Finally, the government objects to the statement in the trial judge's opinion that the government made an assertion in its brief that "at the least approaches the outer limits of 'the Bounds of the Law.' See Disciplinary Rule 7–102, American Bar Association Code of Professional Responsibility." That rule, captioned "Representing a Client Within the Bounds of the Law," provides that in representing a client, a lawyer shall not "(2) knowingly advance a claim or defense that is unwarranted under existing law except that he may advance such claim or defense if it can be supported by good faith arguments for an extension, modification, or reversal of existing law" or "(5) knowingly make a false statement of law or fact."

In its brief before the trial judge, the government stated that our order of April 27, 1978, directed "a determination of the amount of bribes over and above the $30,-000 established by law." The government's theory apparently was that the verdict in the criminal case established that bribes of that amount had been paid. The trial judge referred to the statement in a prior brief by the government in support of its motion for summary judgment that "the conviction under Count Two does not conclusively establish the amount of the bribes. * * * The amount of defendant's damages will have to be determined in subsequent proceedings."

The government erred in interpreting our prior order as establishing that the plaintiff had received at least $30,000 from Lemler. Our order contains no such determination

and referred to no figures. Nevertheless the government had an arguable position that because the bribery count of the indictment charged Lemler with paying the plaintiff $30,000 and because the plaintiff was convicted under that count, the plaintiff was collaterally estopped from denying that he had received that amount. The passage in the government's brief in support of its motion for summary judgment that the trial judge quoted, was taken out of context. The statement that the conviction under count 2 did not conclusively establish the amount of the bribe was made in contending that although the indictment charged receipt of $30,000, the amount actually paid "greatly exceeded" that sum.

In sum, there was no impropriety in the government's argument that the trial judge found objectionable. The trial judge should not have characterized the government's conduct in this case as "approach[ing] the outer limits of 'the Bounds of the Law.'" Although the government's position was erroneous and overstated, it was not improper.

### CONCLUSION OF LAW

The plaintiff is not entitled to recover readjustment pay, and the petition is dismissed. The government is entitled to recover $2,000 on its counterclaim. A judgment to that effect is entered.