**Kevin A. McCARTHY, Trustee in Bankruptcy for Builders International, S.A., (Senegal), Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 235–76.

United States Claims Court.

March 17, 1983.

As Amended April 19, 1983.

See also Ct.Cl., 670 F.2d 996.

---

John Vanderstar, Washington, D.C., for plaintiff. Covington & Burling, Washington, D.C., of counsel.

Alexander Younger, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant. Robert Perkins, Agency for International Development, of counsel.

## OPINION

NETTESHEIM, Judge.

This case comes before the court on plaintiff's application for costs and attorneys' fees and expenses under the Equal Access to Justice Act, Pub.L. 96–481, 94 Stat. 2325, 28 U.S.C. § 2412 (Supp.V 1981). Plaintiff seeks an award for costs in the amount of $34,034 and fees and expenses in the amount of $196,290.

## FACTS[1]

Plaintiff's application involves an arbitral award rendered against an agency of the United States that finally was paid over six years thereafter without interest. The genesis of this case was the construction of a housing project in Dakar, Senegal, between 1968 and December 1970. The project, known as Patte d'Oie, was under the auspices of the Agency for International Development ("AID") and the Government of Senegal ("Senegal"). Under contract with AID, Builders International (Senegal), S.A. ("plaintiff" or Builders"), was to construct and sell the housing project. A maximum of $5,000,000 was available from private sources to finance the project. This financing, however, was guaranteed by AID. After completion of the project, Builders submitted to the Arbitral Tribunal of the International Chamber of Commerce ("ICC") certain disputes arising out of the contract. The arbitration proceeded to an award issued on March 5, 1976, of approximately one-half million dollars in favor of Builders against AID, plus the major portion of costs. AID's counterclaim against Builders based on fraud and misrepresentation was rejected on the merits.

Builders thereafter sued for enforcement of the award, first, in the United States District Court for the District of Columbia and then, after transfer, in the United States Court of Claims, by an application and later a petition. The Claims Court rendered its decision on January 27, 1982, in favor of Builders in the amount of the ICC award. The parties entered into a stipulation for entry of the judgment on June 28, 1982. The present application for fees and expenses before this court followed. Oral argument was heard on March 11, 1983.

### 1. *The Contract*

Builders was organized in 1967 by two American businessmen, Robert F. Flusher and Ezra Cornell IV, to carry out construction of the Patte d'Oie project. The project was administered by AID in conformance with the Foreign Assistance Act of 1961. Under this program AID guaranteed loans made by private investors to contractors of approved projects. The contractors—in this case, Builders—in return gave AID the right of approval over the plans and specifications of the project.

Builders submitted detailed cost estimates for the project in 1967 and 1968, including a breakdown of the items used in

---

1. A detailed recitation of the facts and procedural history of this case, including the arguments that were employed by the parties at each relevant stage of proceedings, is called for because of the episodic nature of the case. Furthermore, as noted by the Federal Circuit in *Broad Avenue Laundry & Tailoring v. United States,* 693 F.2d 1387, 1391 (Fed.Cir.1982),

"Whether the position the United States took in the litigation was substantially justified because it was reasonable depends upon all the pertinent facts of the case."

This court was assigned the case by order entered January 25, 1983, and did not participate in any of the prior proceedings.

constructing several types of houses in the project and an indication of the quantity of items needed, unit price, and total price. On June 1, 1968, Builders and Senegal entered into a contract with AID known as the "Company Agreement." The Company Agreement provided that Builders could not increase the sales price of its houses without AID's prior approval. AID also reserved the right to approve the plans and specifications for the houses, as well as the time at which Builders could begin construction. The agreement provided that AID need consider requests for increases in the price of the houses only in limited circumstances. One of these, however, was any increase in costs caused by AID's alterations of the construction. The agreement provided for binding arbitration before the ICC to resolve any dispute arising out of the contract.

Builders was not the actual contractor on the project. On June 20, 1968, Builders engaged Enterprises Generale du Cap Vert de Travaux Publics et Particuliers Batiments ("EGCAP") as general contractor. EGCAP submitted to Builders several "devis estimatifs" which broke down the total price per house into the items of construction. Although more than one type of house was to be constructed, the parties agreed during the arbitration to use a B–3 house type as the representative house, and this has remained the prototype throughout the litigation. The 1968 devis estimatifs for a B–3 house was approximately $4,328. The contract between Builders and EGCAP reduced the price Builders was to pay to approximately $3,844. Builders' 1968 estimate to AID approximated $3,928.79.

Construction began in late 1968. The method of construction that AID approved for the project included what was known as a steel-frame system. This system involved the use of steel trusses and steel lath to build frames on which cement or plaster could be applied to form the structure. On the basis of information supplied by the Federal Housing Administration, AID ordered Builders on December 23, 1968, to cease using the steel-frame method of construction. By this date Builders had made

substantial progress on the project's first section of 26 houses. AID notified Builders that the steel-frame construction would be permitted in the first 26 houses, but required the conventional method of construction for subsequent houses. Work halted on the project. Builders submitted to AID new plans and cost estimates. However, the cost of construction by convential means proved too high, and in March 1969 AID allowed Builders to resume using the steel-frame method, although requiring Builders to make a number of other changes in the system. Because of a contractual requirement that the houses be sold before construction, Builders was unable to resume full-scale operations until AID's approval of new sales prices was received in November 1969.

Builders submitted the new plan to EGCAP which, in turn, submitted revised estimates to Builders on April 9, 1969. For most of the items, EGCAP did not raise its unit price from 1968 to 1969. However, EGCAP took advantage of the situation to correct mathematical errors that had been made in 1968 and increased the quantity of some items used. EGCAP's April 9, 1969 estimate for a B–3 house was approximately $4,476.

After Builders received the 1969 estimate from EGCAP, Builders negotiated with EGCAP a new lump-sum price for which EGCAP would contract each type of house. This agreement was oral. In reaching the oral agreement with EGCAP, Builders concentrated on reaching a total bottomline cost of constructing each house and did not attempt to establish an item-by-item breakdown of the costs. Instead, Builders simply allocated increased costs among the individual items in its 1969 cost estimates to AID.

On April 30, 1969, Builders submitted to AID a request for an increase in the selling price of each house to reflect the adjustments made in the plan, as well as to offset the increased costs. The 1969 estimate for a B–3 house was $5,394.96. This estimate proved to be within $62.00 of the actual cost finally incurred by Builders and represent-

ed an increase of $1,466.17 over the 1968 estimate of $3,928.79. In reaching this 1969 figure, Builders added the increased amount for which EGCAP had agreed to construct the houses, certain other costs for items not covered by the EGCAP contract, and a contingency factor of eight to ten percent of its costs. With respect to a number of the items used in construction of a B–3 house, unit price increases in Builders' April 30, 1969 estimate to AID were not supported by corresponding increases in the unit price for the same item on EGCAP's April 9, 1969 devis estimatifs to Builders.

Builders contemporaneously requested an approximate 55-percent increase in the sales price from $5,600–7,500 to $9,300–11,600, but AID approved only a five percent increase. The construction and sale of 669 houses was completed by December 1970, the agreed-upon completion date. As of the completion date, however, Builders had incurred a financial loss and the project ended in insolvency and foreclosure proceedings.

### 2. *The Arbitration*

In February 1973, Builders submitted a request for arbitration pursuant to section 5.01 of the Company Agreement with AID.[2] The substance of Builders' claim for over $3,500,000 was that AID had not allowed Builders to reflect in the sales price the increased costs resulting from the change in plans that AID had imposed. AID counterclaimed for $7,500,000, based on fraud and misrepresentation, contending that Builders had misrepresented to AID that no outstanding liens existed.[3] The ICC heard evidence for 18 days during January and February 1975. On January 15, 1976, the ICC determined that the United States had breached the agreement with Builders in two respects and awarded Builders $495,-898.45, plus 75 percent of the costs of arbitration and denied the counterclaim in full on the merits. The award was announced on March 5, 1976.

The ICC delineated two periods of breach by AID during the course of the Patte d'Oie project. The first period ran from December 23, 1968, when AID ordered Builders to stop steel-frame construction and to convert to the conventional concrete method to the date when Builders, following AID's instructions, actually resumed construction in accordance with the new plans and specifications approved by AID. The tribunal found that the stoppage of construction must have continued at least until the end of April 1969 and deemed construction to have resumed at that time. The stop order was not authorized by section 3 of the Company Agreement, which, however, might have permitted a stop order for a brief interval. The ICC determined damages to be those that resulted from the delay and such expenses incurred and losses suffered by Builders in making adjustments in the approved plans and specifications to satisfy AID's requirements, when AID had issued the stop order without a definite idea of the adjustments it would require.

To mark the second aspect of breach, the ICC held that AID was liable to Builders for the changes AID made in the plans and specifications of the houses in the Patte d'Oie project after it once again gave approval to the steel-frame construction method. Pursuant to section 3.01D of their agreement, AID was under an obligation to allow Builders to reflect any incorrect increased costs resulting therefrom in the selling price of the houses. The ICC further held that AID had an implied duty to allow the price increases within a reasonable period of time and that it had breached this duty.

On April 16, 1976, AID, as the United States, filed a motion for modification and correction of the award. AID argued that part of the award was barred by the statute of limitations and that the award must be modified and corrected because it violated the law applicable pursuant to the terms of reference and because it was based on an evident material miscalculation. The ICC

---

**2.** *Builders International (Senegal) S.A., v. United States*, I.C.C. No. 2380 (ICC filed Feb. 9, 1973).

**3.** This was not the basis of defendant's fraud claim in this court.

did not act on the motion, other than to notify the parties on May 13, 1976, that no action would be taken because the award was final.

### 3. The District Court Proceedings

On April 23, 1976, seven days after the United States filed its motion for modification and correction of the award, Builders filed a Petition for Confirmation of Arbitral Award in the United States District Court for the District of Columbia. This petition recited the existence of the Company Agreement and noted that section 5.01 thereof provided for ICC arbitration and judgment to be entered in any court having jurisdiction over any such arbitral award. The jurisdiction of the court was invoked pursuant to 9 U.S.C. § 9 (1976).

Defendant moved on May 3, 1976, for an extension of time to June 3, 1976, within which to respond, contending that service was improper, because Builders had served its petition for confirmation on AID's attorneys in the ICC proceedings, and that AID received a copy of the petition from its attorneys only on April 26, 1976. Defendant also argued that, assuming proper service, an extension should be granted "in view of the necessity of thoroughly researching the novel question of whether the agreement between petitioner and AID to arbitrate the underlying dispute constitutes a waiver of sovereign immunity so as to allow the Court jurisdiction over this action and the existence of potential counterclaims against petitioners . . . ." The district court by order entered May 4, 1976, permitted the extension to May 14, and on that date defendant filed its opposition and also a motion to dismiss or, in the alternative, to modify and correct the award. Defendant's arguments paralleled those before the ICC on the motion for modification, which the ICC did not consider by notice issued on May 13. Whether defendant knew of the May 13th determination when it filed on May 14 is not clear.

The May 14, 1976 opposition and motion to dismiss also employed the same arguments as the motion to extend. Defendant argued that the court lacked jurisdiction over the subject matter in that the doctrine of sovereign immunity barred suit against the United States to confirm arbitral awards and that 9 U.S.C. § 9, pleaded by Builders, was not an independent source of jurisdiction. Defendant also argued that modification of the award was appropriate pursuant to 28 U.S.C. § 1345 (1976), and 9 U.S.C. § 11 on the grounds that part of the award was barred by the applicable statute of limitations, that the award violated applicable laws on damages, and that the award contained evident material miscalculations.

On June 4, 1976, the United States District Court for the District of Columbia, by Judge Howard F. Corcoran, entered a Memorandum and Order transferring the action to the Court of Claims pursuant to 28 U.S.C. § 1406(c) (1976). The court agreed with defendant that the United States had not consented to a suit of this nature in district court.

### 4. Proceedings in the United States Court of Claims

On June 8, 1976, Builders filed in the Court of Claims an Application for Confirmation of Arbitral Award. This application mirrored the petition for confirmation in district court, with one exception, in that the allegation of jurisdiction pursuant to 9 U.S.C. § 9 was omitted, but was cited in support of expedited consideration. Builders also added a short recital of the proceedings in district court.

Defendant on June 18, 1976, moved to dismiss and argued that 9 U.S.C. § 9 did not confer jurisdiction; rather, jurisdiction if any, existed under 28 U.S.C. § 1491 (1976), only if a contract between Builders and the United States existed obligating appropriated funds. Defendant also argued that a claim under 28 U.S.C. § 1491 should, under Rule 35, be pled as a monetary claim against the United States. Without that allegation, the United States argued, the petition should be dismissed. The last contention was that Builders, as a foreign corporation, had an obligation pursuant to 28

U.S.C. § 2502 (1976), to establish reciprocity for arbitral awards in Senegal.

Builders opposed the motion to dismiss on June 25, 1976. The United States' argument that the U.S. arbitration act did not constitute an independent basis for jurisdiction was characterized as beside the point, because the district court had ruled that the Court of Claims had jurisdiction and that Builders was relying on the arbitration act only insofar as its expedited procedures and remedies provided. In addressing defendant's contention that the subject of the arbitration was not a contract obligating appropriated funds, Builders distinguished defendant's authority, *Novid Co. v. United States*, 210 Ct.Cl. 1, 535 F.2d 5 (Ct.Cl., 1976), on the ground that the contract in that case could in no event obligate appropriated funds. Builders argued that it was only when Congress has made clear that appropriated funds must not be involved that the Court of Claims' jurisdiction fails. (This argument later was accepted by the Court of Claims in its January 27, 1982 opinion.) Builders' last point was that reciprocity existed between the United States and Senegal under the Senegalese Civil Code, as adopted from the French Civil Code.

Defendant's reply to this opposition filed on June 30, 1976, repeated its earlier arguments and clarified that defendant's question was whether the three-party Company Agreement among Builders, AID, and Senegal guaranteed anything to Builders when the Agreement demonstrated that AID was guarantying the private investors of Builders in the Patte d'Oie project. In short, Builders was not an investor, and AID's guarantee did not run to Builders' benefit. Defendant stated that, if Builders did plead a monetary judgment for damages, the United States would then be required "to raise whatever defenses are then determined to be applicable—such as the lack of any appropriated fund obligation." Finally, defendant noted that "we have been informed that the third party to the Company Agreement (the Government of Senegal) has paid debts owed by Builders under this project in Senegal amounting to more than the claimed arbitral award. As such, there exists a question of the real party in interest . . . . "

On October 21, 1976, the Court of Claims entered an order suspending plaintiff's motion to establish expedited procedures and dismissing Builders' application without prejudice, with leave to amend. The court ruled that 9 U.S.C. § 9, which was a statute the court had not considered before, did not confer jurisdiction on the district courts or upon the Court of Claims. Jurisdiction was available to Builders under the Tucker Act, although the court pointed out that Builders might assert the arbitration award in support of its entitlement to payment. "A 'confirmation of arbitral award' may be a remedy appropriate in this case and available in this court under Title 9, or the award may be given effect in some other way, but we reach that stage of this proceeding only after this court's jurisdiction is properly invoked. At that time the parties can put the case before the court by cross motions for summary judgment, if that is the procedure they elect."

On October 27, 1976, Builders filed its petition pursuant to the October 21 order, alleging the Tucker Act, 28 U.S.C. § 1491, as a basis of jurisdiction for a money judgment against the United States. The petition reiterated, in its seven pages, the history of the case. Builders cited section 635 of the Foreign Assistance Act of 1961, 22 U.S.C. § 2195(i) (1976) [sic] [§ 2395], as authority for arbitration before the ICC. Builders also cited Article 29 of the ICC rules which states that "the parties undertake to carry out the subsequent award without delay and waive the right to any form of appeal, insofar as such waiver may be valid."

On November 23, 1976, three days before its answer was due, defendant filed a routine motion for an extension of time to December 3, 1976, reciting that a recommendation as to litigation position from AID had not been received.

One Jacques DuBoscq in his capacity as trustee in bankruptcy for Builders filed a motion on November 26, 1976, to be substi-

tuted as plaintiff. On December 2, 1976, defendant further moved to delay its answer in the case until January 7, 1977, or until 15 days after the court ruled on the motion for substitution of counsel, whichever later occurred. This motion was allowed on December 16, 1976.

Beginning even before issuance of the ICC's award and concurrent with the proceedings in the district court and Court of Claims, a series of letters was sent from the Government of Senegal to the U.S. State Department and AID concerning Builders and the Patte d'Oie project. The first, dated January 23, 1976, from Richard Demuth, counsel to the Government of Senegal, referred to the ICC arbitration between Builders and the United States and advised that the Government of Senegal had filed suit against Builders in Dakar, requesting that "if any arbitral award is entered against AID in favor of BIS [Builders], no action be taken by your Agency to discharge that award which might result in the amount awarded becoming unavailable to satisfy any judgment which SICAP [a Senegalese government agency] may obtain in the proceeding which it has initiated towards BIS. We would, of course, be very pleased to consult with you regarding possible means of effecting this objective."

The second letter dated April 29, 1976, was from Andre J. Coulbary, Ambassador to the United States from Senegal, and referred to the April 23, 1976 district court petition. This letter noted that Builders had no significant assets other than its arbitral award. The Ambassador stated that "a miscarriage of justice" would occur if the district court entered judgment on Builders' petition before the Government of Senegal obtained its judgment in the Dakar proceedings. The Ambassador further requested that, if appropriate, the Secretary of State advise the district court judge of these facts. A third letter was sent by the Ambassador under date of November 10, 1976, to the Secretary of State, stating that a bankruptcy proceeding had been instituted by the Government of Senegal against Builders, requesting that no action be taken in the Court of Claims, and asking that the

Department of State refrain from paying any monies to Builders.

By letter of November 17, 1976, the Ambassador further advised the Department of State that Builders had been adjudicated bankrupt and that Mr. Duboscq would enter an appearance as trustee in the Court of Claims proceedings. This letter apparently was delivered to the Department of Justice on November 18, 1976, before defendant asked for additional time to answer Builders' petition. Ultimately, plaintiff filed all four letters with the court in support of its opposition to substitution.

The stay of proceedings remained in effect from December 1976 until December 1978. By order dated December 22, 1978, Trial Judge Roald Hogenson denied Mr. Duboscq's motion for substitution without prejudice pending resolution of the proceedings in the Senegalese courts, terminated the stay, and directed defendant to file its answer to Builders' amended petition by January 31, 1979. Although not cited in the court's order, Builders' motion to set aside the order suspending further proceedings filed November 15, 1978, referred to a July 29, 1978 decision of the Senegal Supreme Court holding that the Government of Senegal had failed properly to substantiate its subrogation claim over Builders.

In May 1977, while the case was suspended, Harry Chapman approached the legal attache at the American Embassy in Hong Kong with the information that he, Lusher, and Cornell had testified falsely before the ICC that EGCAP had raised its prices to Builders. Mr. Chapman was granted immunity by the United States on June 15, 1977, for these alleged acts.

On January 26, 1978, the United States filed an Answer and Special Plea in Fraud and Counterclaim. The answer did not deny the substantive allegations of Builders' petition concerning the issuance and amount of the award. The United States's special plea in fraud alleged that EGCAP had not increased its unit cost to Builders in 1969 from prior levels and that Builders' contrary representations both to AID and

the ICC were known by Builders to be false and were intended to deceive and defraud AID. Defendant further alleged that these fraudulent actions forfeited Builders' claim pursuant to 28 U.S.C. § 2514 (1976). A counterclaim for $2,000 was also asserted pursuant to 31 U.S.C. § 231 (1976), on the basis of the fraud allegations. None of the allegations presented to the district court in defendant's motion to dismiss or other pleadings was included in its answer.

The parties proceeded to discovery. On January 15, 1980, defendant amended its answer. This amendment added as an affirmative defense the court's lack of jurisdiction because any judgment for plaintiff could not be paid from appropriated funds.

On October 31, 1979, Trial Judge Hogenson received defendant's pretrial submission. Defendant represented that its case would show that, contrary to the testimony at arbitration, the April 30, 1969 cost estimates did not reflect increases in costs resulting from AID's changes in plans or from EGCAP's price increases, but instead reflected inflated costs not attributable to plans, changes, or EGCAP's price increases. Defendant asserted that fraudulent inflation was evident not only in the total costs for each house type, but also in the unit costs for the individual items.

In its November 20, 1979 submission, Builders characterized defendant's argument that the April 30, 1969 submission reflected an entirely new recosting of the project—rather than a recost based on AID's changes in the plans—as not a claim that any aspect of the arbitration proceeding was based upon perjury or fraud. Builders argued that defendant admitted, unless fraud was proved, that the court should enter judgment against the United States in accordance with the arbitral award and that the burden of proof to show fraud was clear and convincing evidence. Builders also asserted that fraud could not have been committed where the bottom-line price estimate was not inflated, even though individual items might have been inaccurate.

On January 7, 1980, defendant amended its pretrial submission to assert that the court lacked jurisdiction of plaintiff's claims because there were no appropriated funds out of which to satisfy a judgment.

Trial was held January 28 to 30, 1980. Testimony was taken from Lusher, as an adverse witness, and Chapman for defendant, and Cornell and John A. McCleod, attorney for AID before the ICC, for Builders. Thirty-nine exhibits were introduced into evidence.

Judge Hogenson filed his opinion on March 6, 1980, holding that the court had jurisdiction and that defendant's defense and counterclaim of fraud were not sustained by the evidence. At trial defendant had relied on the devis estimatifs and the cost estimates, in conjunction with the testimony of Chapman, to show that Builders arbitrarily had selected the figures to misrepresent its costs on the April 30, 1969 estimates. The trial judge rejected the jurisdictional argument, noting that the non-appropriated funds exclusion is limited to instances wherein, by law, appropriated funds not only are not used to fund the agency, but cannot be.

Also rejected was defendant's contention that the risk guarantee of the AID program flowed to institutional investors, not to Builders, which would have precluded Builders' right to sue for damages. The court held that the liability asserted against AID was not in the nature of a risk guarantee, but was for a straight, clearcut liability for breach of the Company Agreement which was incidental to the guaranty contracts entered into by AID and Builders' investors.

The court examined the evidence of fraud against the clear and convincing standard governing the forfeiture defense and the standard for the counterclaim which was that Builders knew the claim to be false and intended upon submission to deceive AID. Two types of evidence supported defendant's fraud allegations. The evidence consisted of Chapman's testimony and documentary evidence of alleged discrepancies between the April 30, 1969 estimate to AID

from Builders and the April 9, 1969 estimate from EGCAP to Builders. The trial court stated that Chapman's testimony "was the only evidence directly showing that Lusher and Cornell intended to defraud the United States by manipulating the construction costs." [4] The court did not believe Chapman's testimony. Several months before Chapman went to the authorities, he had been discharged by Builders. He had not been paid $50,000 by Lusher for his help in preparing Builders' case for arbitration. Chapman's son had also been fired by Builders. The court found that, given the animosity between Chapman and Lusher and Chapman's desire for revenge, "and his demeanor on the witness stand, it ... [was] impossible to attach much weight to his testimony. Standing alone, his testimony ... falls far short of the clear and convincing evidence that must be produced to support a forfeiture pursuant to 28 U.S.C. § 2514 (1976)." [5]

The second category of evidence supporting fraud was the documentary evidence. The trial judge interpreted this evidence in light of *O'Brien Gear & Machine Co. v. United States,* 219 Ct.Cl. 187, 591 F.2d 666 (Ct.Cl., 1979), and *Kamen Soap Products Co. v. United States,* 129 Ct.Cl. 619, 124 F.Supp. 608 (Ct.Cl., 1954). The *O'Brien* case included documentary evidence of unsupported entries in plaintiff's books, checking account inconsistencies, and an absence of documentation in bank and cash accounts. Also, a witness made credible testimony as to a check forgery scheme, which, in conjunction with the forged checks themselves, was held to constitute clear and convincing evidence of fraud. In *Kamen* the fraudulent documents were shown to have been printed on forms not used by plaintiff until 1949, although they were alleged to have been prepared during 1947, and had appeared in the litigation only after plaintiff's previously submitted documents had not supported its claim.

Defendant contended here that Builders first determined the total cost it desired for each type of house and then manipulated the unit prices to support the total. In opposition Builders contended that variances did exist, but were due to emphasis on total cost, rather than unit prices. The court found, having reviewed the cost estimates from Builders to AID and the devis estimatifs from EGCAP to Builders, that "it is impossible to find that they provide clear and convincing evidence of fraud." [6]

The court found that the documents did show clearly and convincingly that in 1969 Builders and EGCAP agreed on a total price for constructing the houses and used the lump-sum figure in preparing their estimates. Considering the manner in which Builders and EGCAP reached a total cost agreement, the discrepancy in estimates "is not unusual ...." [7]

The last issue considered by the trial judge was defendant's counterclaim against Builders for $2,000 for making a false claim. The judge noted that the standard applied by the Court of Claims is knowing or negligent submission of a false claim and found that Builders' claim did not rise to the level of fraud under 31 U.S.C. § 231, because "the evidence ... [did] not show that the figures submitted were false." While the figures might have been misleading in relation to earlier estimates, "the total figure that it started with was sound ...." [8]

On June 9, 1981, defendant excepted to the trial judge's opinion. Eleven exceptions were noted, six of which related to increases on five items in the April 30, 1969 Builders cost estimate, which Builders attributed to EGCAP increases on those items, although EGCAP did not show a corresponding increase in its devis estimatifs with

---

4. The opinion is reprinted verbatim with respect to Judge Hogenson's discussion of the evidence on fraud in *McCarthy v. United States,* 229 Ct.Cl. ——, 670 F.2d 996, 1004–1007 (Ct.Cl.1982) (*per curiam*).

5. *Id.* at ——, 670 F.2d at 1004.

6. *Id.* at ——, 670 F.2d at 1005.

7. *Id.* at ——, 670 F.2d at 1006.

8. *Id.* at ——, 670 F.2d at 1006.

respect to those items. The third exception was to allowance of Builders' 1969 cost increases based on EGCAP's correction of mathematical errors in its 1968 devis estimatifs for which EGCAP did not make an actual unit price increase in its 1969 submission to Builders.

The seventh exception was to the court's finding that EGCAP did recost and correct mathematical errors in its 1969 devis estimatifs to Builders. The eighth exception disputed the trial judge's finding that a bottom-line cost per house method was used by EGCAP and Builders in 1969, relying on the 1969 devis estimatifs and an EGCAP invoice, both of which did break down the cost per house and per unit and quantity. The ninth exception was that Builders did not present the contingency fee component to the ICC and that any increased contingency factor would not be an increase in price attributable to a change of plans and specifications, nor did such a factor explain the increase in Builders' prices from 1968 to 1969. The tenth exception reiterated the ninth exception and disputed the eight-to-ten percent contingency factor. Although defendant's exception is vague, it seemed to be that the eight-to-ten percent finding was incorrect, another figure presumably being more accurate. The eleventh exception was to the implication of the finding that Chapman's son had been fired by Builders. Defendant asserted that a decision by the Hong Kong Labor Tribunal in favor of Chapman's son removed any cause for bias based on his firing.

Defendant's brief in support argued the jurisdictional issue and, as to the forfeiture issue, argued that the trial judge did not understand the premise of defendant's case. The brief, however, acknowledged that the trial judge's findings were presumed correct. According to defendant, the court proceeded on the premise that the fraud allegations were predicated upon Builders' submission of false cost estimates to AID in 1969. Rather, defendant premised the fraud plea upon the discrepancies between EGCAP's 1969 devis estimatifs and the evidence presented to the ICC.

Defendant's final argument referred to its false claim counterclaim. The trial judge understood the issue to be whether a violation had occurred by submission of the April 30, 1969 cost estimates to AID, while, actually, defendant contented that the violation occurred when Builders presented its claim for payment of the ICC award.

Plaintiff responded to defendant's exceptions on July 9, 1981, emphasizing the presumption of correctness of the court's findings, especially because they were based, in large part, on the demeanor of the key witness.

On January 27, 1982, the Court of Claims affirmed per curiam. *McCarthy v. United States,* 229 Ct.Cl. ——, 670 F.2d 996 (Fed. Cir., 1982) (hereinafter "*McCarthy*"). With a one-paragraph introduction, the court adopted the trial judge's opinion with unspecified modifications.[9] The court concluded that defendant's exceptions to the proposed findings were either irrelevant or contrary to evidence. The trial judge was upheld in taking jurisdiction and in determining that the defense and counterclaim of fraud had not been sustained by the evidence. The court further ruled that the trial court did understand that the fraud case was premised upon the allegation that evidence offered by Builders to the ICC had been false and fraudulent. *Id.* at ——, 670 F.2d at 998. With respect to the jurisdictional issue, the court cited the recent case of *L'Enfant Plaza Properties, Inc. v. United States,* 229 Ct.Cl. ——, 668 F.2d 1211 (Ct.Cl.1982), and added, "We have no doubt that AID has authority to use appropriated funds if and to the extent appropriated, and that is sufficient to avoid the nonappropriated funds exclusion." *McCarthy,* 229 Ct.Cl. at ——, 670 F.2d at 1002 (citations omitted). Judge Kashiwa concurred clarifying the jurisdictional issue. He stated, "It is well settled that 28 U.S.C. § 2517(a) bars suit only where Congress has affirmatively precluded the use of appropriated funds." *McCarthy,* 229 Ct.Cl. at ——,

**9.** The Court of Claims expanded only on the jurisdictional discussion.

670 F.2d at 1007. Defendant had argued that Congress never specifically had appropriated public monies to the particular AID program in which Builders participated. Judge Kashiwa pointed out that, while Congress intended that AID pay its expenses primarily from non-appropriated monies, it was obvious from 22 U.S.C. § 2183(e) that approriated funds might be needed to satisfy the agency's expenses. *McCarthy,* 229 Ct.Cl. at ——, 670 F.2d at 1007.

## DISCUSSION

As stated at the outset, Builders brought its application for costs, attorneys' fees and expenses pursuant to the Equal Access to Justice Act, Pub.L. No. 96–481, 94 Stat. 2325 (Supp.V 1981) ("EAJA"). Builders seeks costs under the codification of the EAJA at 28 U.S.C. § 2412(a) (previously codified at § 2412), which preserved a law dating from 1966. Attorneys' fees and expenses are sought under two separate provisions of the EAJA. The first is 28 U.S.C. § 2412(b), which, in relevant part, allows reasonable attorneys' fees and expenses to a prevailing party against the United States in any civil action "to the same extent that any other party would be liable under the common law . . . ." thereby allowing relief for prosecution or defenses undertaken in bad faith. The second is 28 U.S.C. § 2412(d)(1)(A), in relevant part allowing attorneys' fees and expenses to a prevailing party against the United States in any civil action by any court having jurisdiction of that action, "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust."

### 1. *The Section 2412(b) Standard*

■ Although 28 U.S.C. § 2412(b) encompasses several situations wherein a party could obtain attorneys' fees and expenses against the United States, the only one alleged by Builders is the "bad faith" exception to the American rule against fee-shifting. The common-law exception applies only when a litigant has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." *Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973); H.R. No. 1418, 96th Cong., 2d Sess. 8–9, *reprinted in* 1980 U.S.Code Cong. & Ad. News, 4953, 4984, 4986–87 (hereinafter the "House Report").[10] The Eleventh Circuit found that the failure of the United States to advise the district court that a similar and likely controlling case was pending decision by the circuit court did not constitute bad faith under section 2412(b). *Donovan v. Dillingham,* 668 F.2d 1196 (11th Cir.1982). Bad faith was found by the trial court in *Fitzgerald v. Hampton,* 545 F.Supp. 53 (D.D.C.1982), under the EAJA when the Air Force satisfied the standard of "insult added to injury" by willfully ignoring the court's order to reinstate an employee. 545 F.Supp. at 56.

### 2. *The Section 2412(d)(1)(A) Standard*

■ The burden is on the United States to show that its position was substantially justified under 28 U.S.C. § 2412(d)(1)(A). *E.g., S & H Riggers v. OSHRC,* 672 F.2d 426, 430 (5th Cir.1982). The Federal Circuit has adopted reasonableness as the standard for substantial justification. *Gava v. United States,* 699 F.2d 1367 at 1370 (Fed.Cir. 1983); *Broad Avenue Laundry & Tailoring v. United States,* 693 F.2d at 1391 (Fed.Cir. 1982) (hereinafter "*Broad Avenue*"). That the United States was or was not the prevailing party is not conclusive that its position was not substantially justified. *Broad Avenue,* at 1391, quoted in *Gava,* 699 F.2d at 1370. An examining court should consider the validity of an agency decision as "one element of evaluating the justification for the government's judicial litigating position . . . .", but not the position of the United States in other forums, and should further consider "all the pertinent facts of the case." *Broad Avenue,* 693 F.2d at 1391, cited in *Gava,* 699 F.2d at 1371. In any event, "[s]ince two cases in litigation are rarely alike, the decision whether the position

---

**10.** The Federal Circuit in *Broad Avenue* cited the House Report in discussing "bad faith," but did not expressly adopt the standard cited therein. At 1391.

of the United States in a particular case was substantially justified is unlikely to be a significant precedent in determining that issue in another case." *Broad Avenue,* 693 F.2d at 1390.

### 3. *The Parties' Arguments on This Application*

Builders submitted affidavits for attorneys' fees and expenses covering what can most easily be discussed as five phases.[11] The first phase is its petition for entry of judgment on the arbitral award before the district court. This period runs from April 23, 1976, the date Builders filed its petition, to June 4, 1976, when the district court ordered the action to be transferred to the Court of Claims. The second phase extends from the filing of the petition in the Court of Claims on June 4, 1976, to the filing of defendant's answer January 26, 1979. The third phase dates from the filing of defendant's answer to the end of the trial before Judge Hogenson—January 26, 1979, to March 6, 1981. The fourth phase extends from the date of Judge Hogenson's opinion to the resolution of the appeal by approval of the Court of Claims of the stipulation of judgment—March 6, 1981, to July 2, 1982. The fifth and final phase extends from the date of filing the application for costs and attorneys' fees and expenses on August 2, 1982, to this court's decision (or further, if appealed).

In support of its application under the "bad faith" provision of section 2412(b), Builders argues that, taken together, the presumption of finality accorded to arbitral awards, the irrelevant arguments against the award made by defendant in its April 16, 1976 motion before the ICC—subsequently abandoned before the trial court and Court of Claims, the letters from Senegalese representatives seeking delay until a bankruptcy trustee could be interposed as plaintiff together amount to a showing of bad faith by defendant in resisting enforcement of the ICC award.

Defendant responds that the "bad faith" standard is narrow and is not satisfied here, because the district court accepted defendant's jurisdictional arguments which made it the prevailing party in that forum and that its position in the Court of Claims was reasonable.

In support of its application under the "substantially justified" standard of section 2412(d)(1)(A), Builders makes several arguments in its application and reply. First, Builders states that it is the prevailing party. Secondly, defendant cannot satisfy its burden of proof that its position in the case was substantially justified because its factual witness, Chapman, was obviously untrustworthy. Thirdly, Builders argues that defendant's jurisdictional argument was not reasonable because the law in the Court of Claims was well settled that suits are barred only where Congress has affirmatively precluded the use of appropriated funds to satisfy a plaintiff's claim—manifestly not the case here. Builders finally contends that no "special circumstances" (citing section 2412(d)(1)(A)) made an award unjust.

The United States argues in rebuttal that its position before this court is the only "position of the United States" subject to review under the EAJA, and that, therefore, no award can be made for the litigation before the federal district court, regardless of whether defendant's position was substantially justified. It further argues by analogy that the "substantially justified" standard for the award of fees in Fed.R.Civ.P. 37(a)(4), which is not met unless no genuine dispute exists, applies to the EAJA. Defendant disputes Builders' characterization of its star witness, Chapman, by noting that credibility is a factual issue, subject to different interpretations by different people. Lastly, legislative history and the failure of Congress to appropriate funds to AID's guaranty program argued for the application of the nonappropriated fund exclusion; even though the defense was only raised incident to trial, defendant would have been remiss not to raise a point so fundamental.

---

**11.** Builders submitted statements for eight phases of work.

Defendant's opposition also discusses the effect of the parties' Stipulation for the Entry of Judgment, which provided that it did not preclude Builders "from applying for attorneys' fees under the Equal Access to Justice Act," arguing that the omission of the word "expenses" now precludes their award.

### 4. The Issues Presented on Plaintiff's Application

The parties joined and briefed the issue of whether this court has jurisdiction to award attorneys' fees and expenses and costs. That issue has been omitted from the review of the proceedings, because this court endorses the well-reasoned and authoritative treatment rejecting defendant's jurisdictional argument by Judge Wood in *Bailey v. United States,* 1 Cl.Ct. 69, 70–74 (Cl.Ct.1983); *accord, Hock v. United States,* 1 Cl.Ct. 416, at 418 (Cl.Ct.1983) (SPECTOR, J.); *Greenberg v. United States,* 1 Cl.Ct. 406 (Cl.Ct.1983) (KOZINSKI, C.J.).

The parties also joined and briefed the issue of whether the EAJA applies to fees and expenses incurred before October 1, 1981, the EAJA's effective date. That issue, too, is absent from review of the proceedings in this case because the Federal Circuit recently held in *Kay Manufacturing Co. v. United States,* 699 F.2d 1376 (Fed.Cir. 1983), that the EAJA was applicable to "fees generated before the effective date of the act as well as after that date." *Id.,* at 1378.

The parties neither joined nor briefed an issue of primary concern to the court, which was discussed with counsel at oral argument on March 11, 1983: whether the court can award attorneys' fees and expenses apportioned for phases of the litigation and positions taken in a given phase or whether it is constrained to an aggregate evaluation of the United States' position over the history of the litigation in this court.

### 5. The Forums to Which the Application Can Extend

■ The EAJA provides, in part, that the court shall award (subject to the standard) fees and expenses "incurred by that party in any civil action ... in any court having jurisdiction of that action." 28 U.S.C. 2412(d)(1)(A). Whether this means that the court having jurisdiction of the action can make an award of fees and expenses only incurred before it or that the court can also grant relief with respect to proceedings before another court is not clear.

The court concludes that it lacks jurisdiction to consider an award for attorneys' fees and expenses incurred in another federal court which could, on its own, entertain Builders' application. This is consistent with the Federal Circuit's admonition in *Broad Avenue,* 693 F.2d at 1390, that the position taken by the United States in other "forums" is not before the court passing on an EAJA application under section 2412 (d)(1)(A) [12] in the United States Claims Court.[13] Thus, the court will not further consider Builders' claim based on the proceedings in federal district court.

### 6. The Apportionment Issue

■ The question presented is whether the court must award or deny fees and expenses under sections 2412(b) or 2412(d)(1)(A) based upon a determination that the "position of the United States" in the civil action, in aggregate, meets the standards of the EAJA, or whether the award can be made for some discrete phases of litigation and positions in a phase which were undertaken in bad faith or as to which defendant's actions were not substantially justified, but concurrently deny any award

12. The court does not need to address the reach of section 2412(b) to proceedings in other forums, because bad faith is not found. Regarding section (a) on costs, our power to tax costs is limited to this court. USCCR 54(d).

13. Builders' reliance on *National Assn. of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1335 (D.C.Cir.1982), is not persuasive. The statutory fee provisions invoked there operate under different standards than the EAJA.

for the phases and positions where the converse is true. The issue arises because, as discussed below, the court finds that defendant's position was substantially justified in all phases of the litigation exclusive of the appeal of the trial court's opinion.

The EAJA does not define the term "position of the United States," as recognized by the Federal Circuit in *Broad Avenue*, 693 F.2d at 1390. An examination of the legislative history and recent authorities suggests that an episodic and issue-by-issue breakdown of the position of the United States is permissible when factually warranted.

In discussing the meaning of the term "prevailing party," the House Report to the EAJA states that "[a] fee award may thus be appropriate ... where an interlocutory appeal is 'sufficiently significant and discrete to be treated as a separate unit' .... " House Report at 11, 1980 U.S.Code Cong. & Ad.News at 4990.

The Federal Circuit has not ruled on the issue.[14] However, in *Kay Manufacturing Co. v. United States*, 699 F.2d 1376, our appeals court differentiated in its analysis of the United States' position between trial and appeal, inviting this court to treat separately the episodes of this case. 699 F.2d at 1379; *Tyler Business Services, Inc. v. NLRB*, 695 F.2d 73, 75 (4th Cir.1982) (footnote omitted) ("[W]e believe 'position'

should be read to mean the government's position as a party in prosecuting or defending the litigation at whatever level is under review for the awarding of attorney's fees."); *see Shumate v. Harris*, 544 F.Supp. 779 (W.D.N.C.1982) (EAJA award for appeal preceding remand);

Recently in *Katz v. Foley*, 698 F.2d 193 (3d Cir.1983), the Third Circuit held precisely that the " 'position of the United States' must be understood to refer to the government's defense against each of the plaintiff's claims presented before the trial court.... [W]e are guided by the Act's governing principle that the United States should pay those expenses which are incurred when the government presses unreasonable positions during litigation."[15] *Id.* at 197. This reasoning is particularly applicable here where the United States has resisted paying an award issued by a tribunal—which the parties agreed would decide such questions—upon its decision which the Court of Claims termed "very able and sound." *McCarthy*, 229 Ct.Cl. at ——, 670 F.2d at 1002.

Based on the foregoing, the court will examine the positions of the United States in the phases of this litigation, determining whether an award of attorneys' fees and expenses is appropriate on the basis of sections 2412(b) or 2412(d)(1)(A).

---

**14.** This Circuit in *Broad Avenue* construed the term in the context of distinguishing between administrative proceedings and judicial review. At 1390–91.

**15.** The rest of the passage, which is also of note, reads:

This principle devolves from the Act's central purpose to eliminate any barrier to litigation challenging unreasonable government conduct presented by the specter of attorneys' fees. We would find it incongruous to deny fees to a prevailing party who identifies and defeats one unreasonable government position simply because the government has substantial justification for defending a second claim in the same action. If fees were denied to a prevailing party in such a circumstance, the purpose of the Act would be thwarted: the prevailing party who has succeeded in obtaining in substantial part all the relief sought in his complaint ... would be obliged to bear the entire burden of his attorneys' fees. The purpose of the Act, however, is to charge to the United States the expenses incurred by a prevailing party who has challenged an unreasonable position taken by the United States. Consequently, any decision requiring that all litigation expenses be borne by the prevailing party, even if the United States has prevailed in one aspect of the action, would undermine a central purpose of the Act. Conversely, it would be anomalous to charge the entire expense of litigation to the government in such a circumstance. Were we to do so, the government would bear the expense of defending even its reasonable positions. Because the Equal Access to Justice Act contemplates deterring only unreasonable government positions, this too would contravene the purpose of the Act. The only solution consonant with the legislative intent as we discern it, is to charge the United States with that portion of the expenses attributable to its unjustifiable positions.
*Id.*, at 197.

*7. The Early Court of Claims Phase*

■ Builders' June 8, 1976 application for confirmation in the Court of Claims was challenged as defective by the United States and dismissed without prejudice on October 21, 1976. By the date defendant's answer was due, a legitimate question as to the proper party plaintiff had arisen which excused the delay in filing of an answer.

However, the finality of arbitral awards is significant to the proposition that defendant acted in bad faith or was not substantially justified in refusing to pay the award, regardless of the technical arguments that were available. *See Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962) (counsel fees awarded where defendant did not investigate claim and neither admitted nor denied it, so that claimant had to prosecute to collect). This is the gravamen of Builders' application based on bad faith: AID, and thereafter the United States, never had any *bona fide* reason not to pay the award, especially before Chapman came forward. Thus, defendant's abandonment of its 1976 position when a viable defense to the ICC award materialized in 1977—Chapman's fraud testimony presentable under 9 U.S.C. §§ 10, 11—is indicative that defendant did not itself put much stock into those arguments.

Although the EAJA does not address arbitral award enforcement, a corollary is present in the House Report's treatment of administrative proceedings which delay enforcement of a party's rights. House Report at 18, 1980 U.S.Code Cong. & Ad.News at 4997; *see S & H Riggers v. OSHRC,* 672 F.2d at 430. In such situations, the United States must make a strong showing of substantial justification for its position, at least on what was essentially an appeal to the trial court with severe limits on the scope of challenge to the arbitral award. The possibility of bad faith, too, must be examined. This is especially true because the United States admitted that, absent fraud, it was bound to make payment.

The Government of Senegal's letters also interject a troubling element. Defendant's opposition to the present application does not address their impact, arguing only that defendant's legal arguments in 1976 were sound and that no showing of impermissible delay has been made. Absent is discussion whether the Senegalese please to defer final action until the Government of Senegal could intervene render defendant's actions suspect. As Builders points out, defendant's argument is essentially that the United States did not act in bad faith (or that its position was substantially justified) because it was successful in delaying payment of the arbitral award. Defense counsel in oral argument, however, pointed out that defendant had not withheld from the court early advice of the Government of Senegal's claim and so notified the court in a June 30, 1976 pleading, raising at that time the issue of the real party in interest.

The court concludes that, as soon as the United States was on notice that a real party in interest question was pending because of the Senegalese bankruptcy proceedings (by the Ambassador's letter of November 10, 1976), it was justified in using whatever credible legal tactics were available to delay making payment to what could be an improper party.

Whether defendant's November 23, 1976 motion for extension was motivated by a need to consult with AID or was made solely to gain time to flesh out an argument based on real party in interest is thus irrelevant. Even though Builders, as an insolvent company, is precisely the kind of opponent most likely to be oppressed by delay, House Report at 10, U.S.Code Cong. & Ad. News at 4988, the issue involving real party in interest was real, supplying substantial justification for not going forward and absolving the United States of a charge of bad faith. In the proceedings in the Court of Claims before late 1976, defendant's position was based on technicalities, to be sure, but legitimately related to our predecessor court's rules of pleading and practice.

*8. The Trial Phase*

Once Chapman came to defendant with his charges of fraud, defendant's position at trial became substantially justified and was

not taken in bad faith. The United States had every right to test Chapman's credibility at trial, as was done. That another immune witness controverted part of his story is not persuasive otherwise, nor are the general indicia of the untrustworthiness of Chapman's testimony noted by the trial court. Builders' initial 55-percent mark-up request in the price of houses made AID skeptical about Builders and suggested a basis for believing Chapman's story. The weaknesses of the documentary evidence were not so great that the discrepancies therein could not—with Chapman's story—perhaps have supported a finding of fraud by Builders.

### 9. *The Appeal Phase*

Defendant does not brief this phase (except as to the jurisdictional argument) and was asked its views in oral argument. The United States' arguments against going to the reasonableness of defendant's position at trial are distinguishable from the reasonableness of an appeal. The court finds that the United States' appeal of the trial court's decision was not substantially justified,[16] but that a special circumstance is present that makes an award to Builders unjust as to the appeal of the jurisdictional issue. This finding rests on the preliminary finding that none of the issues on appeal—the jurisdictional question, documentary evidence of fraud, and testimonial evidence of fraud—was substantially justified.[17]

Defendant argued that Congress had not appropriated money for AID's housing guaranty program, concluding that the mandate of 28 U.S.C. § 2517 that Court of Claims judgments be paid only from appropriated funds barred jurisdiction of this action. On appeal the Court of Claims rejected that argument citing the later decided

*L'Enfant Plaza Properties, Inc. v. United States,* 229 Ct.Cl. ——, 668 F.2d 1211 (Ct. Cl.1982), for the proposition that the non-appropriated funds exclusion is limited to situations where appropriated funds not only are not used to fund the agency, but cannot be. However, both the majority and concurring opinions show beyond cavil that the law was settled on point long before *L'Enfant Plaza* issued. *McCarthy,* 229 Ct.Cl. at ——, 670 F.2d at 1002, 1007. The fact that the United States added this defense at the last minute to both its answer and its pretrial submission also indicates that a measure of concern as to its success with Chapman was present.

The court nonetheless must conclude that under former Court of Claims Rules 141(b), the lack of finality of the trial court's opinion constitutes a special circumstance that would make an award on this position unjust. The appeal on the jurisdictional issue may have been motivated by a desire to ask a court with power to enter a judgment to consider the question, even though the arguments against the trial judge's recommended decision reasonably could not call for any other result.

The second issue on appeal concerned the documentary evidence of fraud. The trial judge, as endorsed by the Court of Claims, found the evidence unpersuasive under the precedents of *O'Brien Gear & Machine Co. v. United States,* 219 Ct.Cl. 187, 591 F.2d 666 (Ct.Cl.1979), and *Kamen Soap Products Co. v. United States,* 129 Ct.Cl. 619, 124 F.Supp. 608 (Ct.Cl.1954). This case presented no obviously fraudulent documents nor credible testimony as were present in *O'Brien.* In *Kamen* the falsity of the documents was shown by the fact that they were written on forms not produced until

---

16. Builders does not assert that the appeal was taken in bad faith, and the court would find an absence of bad faith if the application were construed otherwise.

17. The United States also argued that the trial judge misapprehended the issue being tried. According to defendant, the trial judge thought the issue at trial was the legitimacy of Builders' April 30, 1969 cost estimates, when the actual issue was the allegedly fraudulent nature of the

evidence presented to the ICC. The Court of Claims stated briefly that "[c]ontrary to defendant's present argument, the trial judge understood [the issue] and did not suppose the fraud was in any other context." *McCarthy,* 229 Ct.Cl. at ——, 670 F.2d 998. The trial judge's decision had noted that the April 30, 1969 cost estimates presented were in the context of Chapman's lying to the ICC.

after the time the alleged entries were made, which, again, is not similar to the documentary evidence in this case. The United States itself noted that "the absence of testimony bearing on fraudulent intent [in another case] resulted in a failure of proof because a 'compelled inference' of fraud could not be drawn from the documents themselves . . . ." citing *Law v. United States*, 195 Ct.Cl. 370, 440–42 (1971).

Six of the United States' eleven exceptions dealt with increases in the April 30, 1969 unit cost estimates without corresponding increases by EGCAP, but the trial judge accepted Builders' explanation that the parties agreed to a total house price that subsumed such figures. The seventh and eighth exceptions dealt with EGCAP's correction mathematical errors and the total house price agreement, both of which were supported by testimony from the ICC. The ninth and tenth exceptions attacked the basis of the contingency factor added by Builders in its April 30, 1969 cost estimate, which objection went to the merits of the case presented to the ICC and not to the fraud issue. The eleventh exception, that Chapman was not prejudiced by his son's dismissal by Builders, was wholly unpersuasive. In sum, defendant could make an argument below on the documentary proof, because the court may have found that Chapman provided corroboration, but on appeal, with the judge's determination on Chapman's credibility presumed to be correct, the argument was moot.

The third issue before the Court of Claims concerned the credibility of Chapman, who was the linchpin of the United States' case. The factual determinations of the trial judge are accorded a strong presumption of correctness under former Court of Claims Rule 147(b); *Connolly-Pacific Co. v. United States*, 175 Ct.Cl. 134, 138, 358 F.2d 995, 997 (Ct.Cl.1966) (strong affirma-

tive showing necessary to overcome presumption of correctness); *Commerce International Co. v. United States*, 167 Ct.Cl. 529, 537, 338 F.2d 81, 86 (Ct.Cl.1964) (burden of sustaining exception is far from slight), especially when credibility is in issue, *Sangemino v. United States*, 227 Ct.Cl. 64, 645 F.2d 45, 51 (Ct.Cl.1981), *cert. denied*, 454 U.S. 1150, 102 S.Ct. 1016, 71 L.Ed.2d 305 (1982) (court will not substitute judgment when trial judge discredited witness testimony); *Davis v. United States*, 164 Ct.Cl. 612, 616–17 (1964) (due regard to commissioner's opportunity to judge credibility and presumption of correctness). *But see Miller v. United States*, 213 Ct.Cl. 59, 550 F.2d 17, 19 (Ct.Cl.1977).

The trial judge found that Chapman changed his testimony from the arbitration because "he believed that Lusher had cheated him and he wanted revenge."[18] He also found that the existence of enemity between Chapman and Lusher as well as Chapman's demeanor on the witness stand discredited the witness' testimony. Excepting to these findings, defendant offered only the statement that a Hong Kong Labor Board decision in favor of Chapman's son concerning his dismissal by Builders removed the son's firing as a motivating factor for Chapman's trial testimony. Essentially, defendant reasonably could not challenge the trial judge's determination of Chapman's credibility, after the court's express finding that "it is impossible to attach much weight to his testimony. . . ."[19] and therefore lacked substantial justification in doing so.

A reading of the record satisfies the court that defendant took its appeal with a solid factual record against it and no reasonable expectation that a reviewing court could reject the trial court's opinion on the fraud issues.[20] This position was unreasonable.[21]

---

**18.** *McCarthy*, 229 Ct.Cl. at ——, 670 F.2d at 1004.

**19.** *Id.*, at ——, 670 F.2d at 1004.

**20.** Defendant at oral argument made much of *Miller v. United States*, 550 F.2d 17, also involving a fraud defense and counterclaim under

the False Claims Act, wherein the Court of Claims rejected detailed credibility findings of the trial judge because she misconstrued the evidence submitted and thereafter upheld in part the fraud counterclaim, still denying the fraud defense. In so doing, the Court of Claims

**21.** See note 21 on page 463.

## 10.  *The Amount of the Award* [22]

The EAJA provides that "attorney fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii). A rate of $75 per hour shall be awarded in this case.

The declaration of plaintiff's counsel states that 71 hours of time were spent by attorneys on the appeal and remand phases of the litigation. As with an appeal, expenses and fees on remand are awardable. *Environmental Defense Fund, Inc. v. Environmental Protection Agency,* 672 F.2d 42 (D.C.Cir.1982) (fees for post-decision negotiations work allowed). Plaintiff prevailed on three of four (*see supra* note 17 and accompanying text) issues addressed by the appeals court. Three fourths of the attorneys' fees and expenses will be awarded to plaintiff. Calculating the award based on number of pages authored or attention by the reviewing court is unworkable. Moreover, customarily attorneys do not ascribe their time to issues in a brief; if they did, time could not accurately be compensated for statements of facts and other general discussion.

The court also will award Builders its attorneys' fees in prosecuting the application. *Tyler Business Services, Inc. v. NLRB,* 695 F.2d 73, 77 (4th Cir.1982). Plaintiff's counsel advises that 202.25 hours were spent in prosecuting its application, which the court deems reasonable. While the appeal is by far the smallest component of Builders' other phases of the litigation in the Court of Claims, certain arguments common to all the proceedings had to be briefed, in any event—for example, the factual history, the EAJA jurisdictional issue, the award of pre-October 1, 1981 fees (the latter two raised by defendant). Furthermore, the policy of the EAJA is to encourage such applications, House Report at 6, 1980 U.S.Code Cong. & Ad.News at 4984, especially when, as here, none of the applicant's arguments was insubstantial. An application is either granted or not, and, however modestly, this one is. [23] A full award, based on $75 per hour, is justifiable in terms of the speculative nature of any alternative and the wasteful consumption of attorney and court time and increased attorneys' fees incurred in attempting to allocate the application to one phase, and the positions therein, of the litigation.

Plaintiff's application is granted in part and denied in part. The reasonable value

did not find clear and convincing evidence of fraud—rather, negligence and ineptitude. The forfeiture was allowed based on documentary evidence, coupled with plaintiff's testimony discredited on appeal. Here, in contrast, are present findings discrediting testimony of a perjured witness based not on his demeanor alone, but other extrinsic evidence demonstrating his motivation to testify falsely. *Miller* involved credibility findings *pro* plaintiff based on little other than demeanor. *Miller* provides no authority that the Court of Claims found discredited witnesses credible on appeal.

Moreover, *Miller* is not authority that the Court of Claims generally disregarded the Rule 147(b) language that "due regard shall be given to the circumstance that the trial judge had the opportunity to evaluate the credibility of the witnesses . . . ." Rather, our predecessor court on occasion substituted its findings when the weight of testimony did not support a finding below. *E.g., Miller v. United States,* 168 Ct.Cl. 498, 501, 339 F.2d 661, 662 (Ct.Cl.1964) (trial commissioner failed to give weight to testimony contradicting plaintiff).

**21.** The court is not basing its decision on the fact that the Court of Claims termed all of defendant's exceptions as "either irrelevant or contrary to the evidence." *McCarthy,* 229 Ct.Cl. at ——, 670 F.2d at 998. The Federal Circuit in *Gava v. United States,* 699 F.2d at 1371, instructed this court that "highly critical language" of the United States by the Court of Claims does not render its position substantially unjustified.

**22.** The court is unpersuaded that the stipulation for entry of judgment filed June 28, 1982, was intended to waive Builders' right to expenses by referring only to attorneys' fees.

**23.** Making an award on issues would not be workable. Applicant "won" two significant jurisdictional issues dealing with the application—not involving the defendant's conduct in the underlying litigation—and the one issue dealing with the litigation. Among others, the question arises as to whether the issues should be factored equally.

of the services rendered by Builders' counsel on the three issues on appeal that are taxable under the EAJA is $3,993.75 (three-fourths of $5,325.00). Plaintiff is also awarded its attorneys' expenses on those issues of $747.86 (three-fourths of $997.15), plus $15,168.75 representing the attorneys' fees on its application. Judgment will enter to the foregoing effect.

IT IS SO ORDERED.

Costs[24] of the action in the Court of Claims and of this application will be assessed against defendant.

---

**24.** The Court of Claims did not award Builders the costs of the action. However, 28 U.S.C. § 2412(a) invites this court to revisit the matter on an EAJA application.